NORTHERN PACIFIC RAILROAD COMPANY, Plaintiff and Appellant *v.* JERRY A. BARNES, County Treasurer of McLean County, Defendant and Respondent.

### Constitutional Law—Legislative Powers—Taxation.

1. The taxing power is a legislative power, and such power passed to the territorial legislature of Dakota by virtue of the general grant of legislative power made by congress in the organic act. The power resided in the legislature without any limitations or restrictions whatsoever upon its exercise, except such limitations as were imposed by the organic act itself and the federal constitution.

2. There is nothing in the provisions of § 6 of the organic act under which the territory of Dakota was organized, or the fourteenth amendment of the federal constitution, which prohibited the legislature of said territory from enacting chapter 99 of the laws of 1883.

CORLISS, C. J., dissenting.

(Opinion Filed Jan. 12, 1892.)

*A* PPEAL from district court, Burleigh county; Hon. RODERICK ROSE, Judge.

*James McNaught, John C. Bullitt, Jr.,* and *Hollembaek & Long,* for appellant. *N. F. Boucher, Louis Hanitch,* and *R. H. Copeland,* for respondent.

Action by the Northern Pacific Railroad Company against Jerry A. Barnes, county treasurer of McLean county, to restrain the sale of certain land for taxes. Judgment dismissing the action on demurrer. Plaintiff appeals. Reversed.

James McNaught and John C. Bullitt, Jr., for appellant:

The sale of the plaintiff's land is unauthorized because the taxes are void by reason of defects in the assessment and levy. Morrill v. Taylor, 6 Neb. 236; Clark v. Crane, 5 Mich. 151; Marsh v. Clark County, 42 Wis. 502; Van Rensslaer v. Witbeck, 7 N. Y. 517; Westfall v. Preston, 49 N. Y. 349; Bradley v. Ward, 58 N. Y. 401; Silsbee v. Stockle, 44 Mich. 461; Dickison v. Reynolds, 48 Mich. 158; Brevoort v. City of Brooklyn, 89 N. Y. 128; McClure v. Warner, 16 Neb. 447; McNish v. Perrine, 14 Neb. 582; Lyman v. Anderson, 9 Neb. 367; Westbrook v.

Miller, 30 N. W. Rep. 916; Shattuck v. Bascom, 12 N. E. Rep. 283; Smith v. Hard, 8 Atl. Rep. 317; Bundy v. Wolcott, 10 Atl. Rep. 756; Warren v. Grand Haven, 30 Mich. 24; Grand Rapids v. Blakely, 40 Mich. 367; Crooks v. Whitford, 47 Mich. 283; Griggs v. St. Croix Co., 20 Fed. Rep. 341; Tunbridge v. Smith, 48 Vt. 648; Walker v. Burlington, 56 Vt. 131; Reed v. Chandler, 32 Vt. 285; Sinclair v. Learned, 51 Mich. 335; People v. Towler, 56 N. Y. 253; Plumer v. Marathon Co., 46 Wis. 179; Scheiber v. Kuehler, 49 Wis. 291; Tierney v. Union Lumber Co., 47 Wis. 248; Marshall v. Benson, 48 Wis. 558; Rowe v. Hulett, 50 Vt. 643; Robson v. Osborn, 13 Tex. 299; Woffard v. McKinna, 23 Tex. 36; Davis v. Farnes, 26 Tex. 296; Matteson v. Rosendale, 37 Wis. 254. The county clerk failed to make out in duplicate the tax lists containing each tract valued and taxed separately and with the several species of taxes and the total of all the taxes carried out in separate columns opposite each tract. Either of these defects is fatal to the tax. State v. Williston, 20 Wis. 240; Crane v. City of Janesville, 20 Wis. 321; French v. Edwards, 13 Wall. 506; Terrill v. Groves, 18 Cal. 149; People v. Sierra Buttes Mining Co., 39 Cal. 511; Cadwalader v. Nash, 14 Pac. Rep. 385; Hamilton v. Fond du Lac, 25 Wis. 490; Shimin v. Inman, 26 Me. 228; Barker v. Blake, 36 Me. 433; Sargent v. Bean, 7 Gray 125; Jennings v. Collins, 99 Mass. 29; Willey v. Scoville, 9 Ohio 43; Farnham v. Jones, 32 Minn. 7; Hanscom v. Hinman, 30 Mich. 419; Rayner v. Lee, 20 Mich. 384; Seymour v. Peters, 35 N. W. Rep. 62; 1 Desty on Taxation, 573. Where the assessment fails to distinguish the amounts of the state, county and town taxes, but blends the whole in one aggregate sum, the blending is fatal to the levy. Thayer v. Stearns, 1 Pick. 482; People v. Moore, 1 Idaho 662; Merrill v. Swartz, 39 Ill. 108; State v. Falkinburge, 15 N. J. Law 326; Case v. Dean, 16 Mich. 12; Railroad Co. v. Hillegas, 18 N. J. Law 11. The Political Code provides that the duplicate tax list shall have attached to it the warrant of the county commissioners, which shall be the treasurer's authority to collect the tax. In the case at bar no such warrant accompanied the list, and hence the treasurer has no legal right to collect the tax on plaintiff's property nor sell the same for such taxes.

Cooley on Taxation, 2d Ed. 424; Hilbish v. Horner, 58 Pa. St. 93; Taft v. Barrett, 58 N. H. 447; Pearson v. Canney, 64 Mo. 188; Donald v. McKinnon, 17 Fla. 746; Blackwell on Tax Titles, 168. The notice of sale was not given as required by the statute and hence any sale made by the treasurer will be defective and void. Cooley on Taxation, 2d Ed. 482; Washington v. Pratt, 8 Wheat. 681; Early v. Doe, 16 How. 610; Moulton v. Blaisdell, 24 Mo. 283; Flint v. Sawyer, 30 Me. 226. The notice of sale was not given for the length of time required by the statute, which is as fatal as if no notice had been given at all. Prindle v. Campbell, 9 Minn. 220; State v. Newark, 36 N. J. Law 288; Early v. Doe, 16 How. 610; Haskell v. Bartlett, 34 Cal. 281; San Francisco v. McCain, 50 Cal. 210; People v. McCain, 51 Cal. 360; Kellogg v. McLaughlin, 8 Ohio 114; . Westbrook v. Wiley, 47 N. Y. 457; Hilgers v. Quinney, 51 Wis. 62; Stewart v. Meyer, 54 Md. 454; Renshaw v. Imboden, 31 La. 661; Pennell v. Monroe, 30 Ark. 661; Clark v. Rowan, 53 Ala. 400; Dubuque v. Wooten, 28 Iowa 571; Ormsby v. Louisville, 79 Ky. 197; Sheehy v. Hinds, 27 Minn. 259. The lands were not definitely described or designated in the notices and therefore a sale based thereon would be void. Cooley on Taxation, 2d Ed. 486; Farnum v. Buffum, 4 Cush. 260; Bidwell v. Webb, 10 Minn. 59; Bidwell v. Coleman, 11 Minn. 78; Williams v. Central Land Co., 32 Minn. 440. It is admitted by the demurrer that the amount of the taxes could not be ascertained from an inspection of the notices, and this makes a sale thereunder invalid. Braley v. Seaman, 30 Cal. 610; People v. Savings Union, 31 Cal. 132; Tidd v. Rines, 26 Minn. 211; Wood v. Freeman, 1 Wall. 393; Alexlexander v. Pitts, 7 Cush. 503. Injunction will lie to prevent the threatened sales. The rule is that while the mere illegality of the tax will not warrant the interference of a court of equity, yet where the collection of the tax will create a cloud on the title injunction lies to prevent such collection. Union Pacific Railroad Co. v. Cheyenne, 113 U. S. 516; Hannewinkle v. Georgetown, 15 Wall. 547; Dows v. City of Chicago, 11 Wall. 108; State Railroad Tax Cases, 92 U. S. 575; Minnesota Linseed Oil Co. v. Palmer, 20 Minn. 24; Small v. City of St. Paul, 20 Minn. 459; Mayall v. City of St.

Paul, 30 Minn. 294; Dean v. Madison, 9 Wis. 402; Crooke v. Andrews, 40 N. Y. 547; Cooley on Taxation, 2d Ed. 780.

A tax levied under an unconstitutional law, or under a void law, or under no law at all, or on property exempt by law from taxation, is absolutely void, and its collection may be enjoined and the maxim—"he who asks equity must do equity"—which defendant invokes, can have no application for the reason that the defendant has no "equity" to receive such a tax and consequently the plaintiff is under no obligation to pay or tender any part of it. Louisville Railroad Co. v. Gaines, 3 Fed. Rep. 266; Earl v. Duras, 13 Neb. 234; Union Pacific Railroad Co. v. Cheyenne, 113 U. S. 516; Savings Bank v. City of Adrian, 33 N. W. Rep. 304; Morris Canal Co. v. Jersey City, 12 N. J. Eq. 227; Railroad Co. v. Jersey City, 9 N. J. Eq. 434; Jones v. Davis, 35 Ohio St. 474; Cook County v. Railroad Co., 35 Ill. 460; Railroad Co. v. McLean, 17 Ill. 291; Gates v. Barrett, 79 Ky. 295; Railroad Co. v. Warren Co., 5 Bush 243; Christie v. Malden, 23 W. Va. 667; Wright v. Railroad Co., 64 Ga. 796; Smith v. Long, 20 Fla. 697; Gould v. Mayor of Atlanta, 55 Ga. 678; Railroad Co. v. Wright, 68 Ga. 311; Kimball v. Merchants Saving Co., 89 Ill. 611; Ramsey v. Hoeger, 76 Ill. 432; Railroad Co. v. Cole, 75 Ill. 591; Drake v. Phillips, 40 Ill. 388; Knight v. Flatrock Turnpike Co., 45 Ind. 134; Riley v. Western Union Telegraph Co., 47 Ind. 511; Northern Pacific Railroad Co. v. Traill Co. 115 U. S. 600; Minnesota Linseed Oil Co. v. Palmer, 20 Minn. 468; Mayall v. City of St. Paul, 30 Minn. 294; Dean v. Charleton, 23 Wis. 590; Railroad Co. v. Taylor Co., 52 Wis. 37. A tax levied by persons not created by law the proper officers for that purpose, is absolutely void, even though the tax itself may be authorized by law, and its collection may be enjoined, the maxim having no application, for the reason that only those officers can levy taxes to whom the statutes entrusts that duty, and hence a tax not levied by such officers is no tax at all and the plaintiff is under no obligation to pay it. Town of Ottawa v. Walker, 21 Ill. 605; Collins v. Davis, 10 N. W. Rep. 643; Lemont v. Singer Stone Co., 98 Ill. 94; Palmer v. Rich, 12 Mich. 415; Kinyon v. Duchene, 21 Mich. 498; Winston v. Railroad Co., 1 Baxt. 60; Greenwell v. Commonwealth, 78 Ky. 320. A tax which is partly legal and partly

illegal is governed by the maxim as to the legal part, and its collection cannot be enjoined *in toto*, but only as to the illegal part; and then only upon payment of the part conceded and admitted to be legal, the reason being that the defendant has an "equity" to receive the part conceded by the plaintiff to be legal and the latter must "do equity" by paying it. Conway v. Waverly, 15 Mich. 257; Palmer v. Napoleon, 16 Mich. 176; Bank v. Cook, 77 Ill. 622; Binkert v. Jansen, 94 Ill. 283; Miles v. Ray, 100 Ind. 166; O'Kane v. Treat, 25 Ill. 557; Taylor v. Thompson, 42 Ill. 9; Briscoe v. Allison, 43 Ill. 291; Reed v. Tyler, 56 Ill. 288; Barnett v. Cline, 60 Ill. 205; Johnson v. Roberts, 102 Ill. 655; Harrison v. Haas, 25 Ind. 281; Roseberry v. Huff, 27 Ind. 12; Commissioners v. Elston, 32 Ind. 27; Adams v. Castle, 30 Conn. 404; Morrison v. Hershire, 32 Iowa 271; Corbine v. Woodbine, 23 Iowa 297; Casady v. Lowry, 49 Iowa 523; Wilson v. Logendyke, 32 Kan. 267; Twombly v. Kimbrough, 24 Ark. 459; Worthen v. Badgett, 32 Ark. 496; Manufacturing Co. v. Spigener, 49 Ala. 262; City of Montgomery v. Sayre, 65 Ala. 564; Insurance Co. v. Lott, 54 Ala. 499; Cheney v. Jones, 14 Fla. 587; Commissioners v. Union Mining Co., 61 Mo. 545; Overall v. Ruenzi, 67 Mo. 203; Wright v. Railroad Co., 64 Ga. 783; Connors v. City of Detroit, 41 Mich. 128; Hare v. Carnall, 39 Ark. 196; Ottawa Glass Co. v. McCaleb, 81 Ill. 557; Hersey v. Board of Supervisors, 16 Wis. 185; Bond v. Kenosha, 17 Wis. 284; Mills v. Charleton, 29 Wis. 400; Dean v. Borchsenius, 30 Wis., 236; City of Lawrence v. Killam, 11 Kan. 499; Challis v. Hekelnkaemper, 14 Kan. 474; Pritchard v. Madren, 24 Kan. 486; Cartwright v. McFadden, 24 Kan. 662; Miller v. Ziegler, 31 Kan. 42. A tax is not void when the only defect in it consists of mere informalties or irregularities in its levy or assessment, not going to its substance, and the maxim applies so as to prevent equitable relief until the plaintiff pays or tenders the tax, the reason being that such a tax, although subject to formal and technical objections, is nevertheless in substance just and equitable and should in equity be paid. Moore v. Wayman, 107 Ill. 192; Cauldwell v. Curry, 93 Ind. 363; Mills v. Johnson, 17 Wis. 598; Hagaman v. Commissioners, 19 Kan. 394; Challis v. Atchinson Co., 15 Kan. 49; Knox v. Dunn, 22 Kan. 475; Boek

v. Merriam, 10 Neb. 199; Hunt v. Esterday, 10 Neb. 165; Wood v. Helmer, 10 Neb. 65; Fifield v. Marinette County, 62 Wis. 532; Railroad Co. v. Lincoln Co., 67 Wis. 478; Smith v. Commissioners, 9 Kan. 296. Injunction or other appropriate relief lies in favor of a plaintiff in all cases where such defects have occurred in the levy or assessment of the tax as go to its substance, and are not mere informalities or irregularities; or the plaintiff does not concede that the tax or any part thereof is equitably due the defendant, and it does not clearly appear that it is due, the reason being, in the first instance, that the tax is void, and hence defendant has no "equity" to receive it, and in the second that plaintiff is under no obligation to pay a tax not clearly due. Huntington v. Central Pacific Railroad Co., 3 Sawy. 503; Tilton v. Oregon Railroad Co., 3 Sawy. 22; Jenkins v. Supervisors, 15 Wis. 12; Mitchell v. City of Milwaukee, 18 Wis. 99; Crane v. City of Janesville, 20 Wis. 305; Hamilton v. Fond du Lac, 25 Wis. 490; Hassen v. City of Rochester, 67 N. Y. 529; Folkerty v. Powers, 3 N. W. Rep. 857; Dean v. Madison, 9 Wis. 402; Scott v. Onderdonk, 14 N. Y. 9; Hatch v. Buffalo, 38 N. Y. 276; Allen v. City of Buffalo, 39 N. Y. 386; Sewall v. City of St. Paul, 20 Minn. 511; Marion County v. Barker, 25 Kan. 258; Cartwright v. McFadden, 24 Kan. 662; Myrick v. La Crosse, 17 Wis. 442.

The "Gross Earnings Law" exempted from taxation all property lawfully owned and held by the plaintiff, whether used in the operation of its line of railroad or not. But if the statute had gone no further than to declare that the capital stock of the plaintiff should be exempt, all its property would have been exempt. Scotland County v. Railroad Co., 65 Mo. 123; Railroad Co. v. Shacklett, 30 Mo. 550; Baltimore v. Railroad Co., 6 Gill. 288; Railroad Co. v. Mayor, 14 Ga. 275; New Haven v. City Bank, 31 Conn. 106; Commissioners v. Railroad, 47 Md. 592; Bibb Co. v. Central Road Co., 40 Ga. 646; Bank Tax Case, 2 Wall. 200. In the absence of constitutional inhibition the power to make a law like the one in question, commuting taxes on the payment of a certain sum, is undoubted. Daughdrill v. Insurance Co., 31 Ala. 91; State v. Railroad Co., 45 Md. 351; Worth v. Railroad Co., 89 N. C. 291; Piqua Bank v. Knoop, 16

How. 369; Dodge v. Woolsey, 18 How. 331; Jefferson Bank v. Skelly, 1 Black 436; Wright v. Sill, 2 Black 544; Delaware Tax Case, 18 Wall. 206; Gardner v. State, 21 N. J. Law 557; United, etc., Co. v. Commissioner, 37 N. J. Law 240; State Lottery v. New Orleans, 24 La. Ann. 86; Leroy v. Railroad Co., 18 Mich. 233; State Bank v. People, 5 Ill. 303; St. Louis v. Savings Bank, 49 Mo. 574; Bank v. Commonwealth, 6 Bush. 127; Mobile v. Insurance Co., 53 Ala. 570. If there is any doubt as to the meaning of a statute that doubt must be resolved in favor of the validity of the law. The presumption that the legislature intended to act within the constitutional limits operates to resolve a doubt so as to sustain a statute. Endlich on Interpretation of Statutes, 233; French v. Teschemaker, 24 Cal. 554; Palms v. Shawano, 61 Wis. 217; Colwell v. May's Landing Co., 19 N. J. Eq. 249; Attorney General v. City of Eau Claire, 37 Wis. 438; Duncombe v. Prindle, 12 Iowa 8; Iowa Homestead Co. v. Webster County, 21 Iowa 227; Cranda County v. Brogden, 112 U. S. 261; Sykes v. Mayor, 55 Miss. 115.

J. M. Bartholomew, for respondent LaMoure County:

Appellant's position is that it has never acquired any taxable title to these lands, but that it has acquired some indefinite and undetermined equity therein which enables it to ask the protection of a court of chancery. Respondent's position is that appellant has a taxable title to said lands or it has no interest whatever in said lands that gives it a standing in court. Respondent claims that appellant has done every act that it is required by its grant to do to entitle it to a patent for these lands, and if that be true then the lands are clearly taxable. Railroad Co. v. Prescott, 16 Wall. 608; Ross v. Outagamie Co., 12 Wis. 29; Railroad Co. v. Trempeleau Co., 35 Wis. 258; Railroad Co. v. Taylor Co., 52 Wis. 37; Iowa Homestead Co. v. Webster County, 21 Iowa 221; Railroad Co. v. Holdsworth, 47 Iowa 20. But the chief contention in this case arises upon appellant's claim of immunity from taxation by reason of the "Gross Earnings Law." But it cannot be claimed that this statutory provision is more effective and far reaching than a charter provision exempting all property from taxation, and it

is the doctrine that the exemption in a charter only extends to the property necessary for the business of a corporation.

Property beyond the legitimate wants of a corporation for its corporate purposes is not within an exemption of all property from taxation. Desty on Taxation, Vol. 1, p. 146; Bank v. Tennessee, 104 U. S. 497; Railroad Co. v. Berks County, 6 Pa. St. 70; Railroad Co. v. Burlington, 28 Vt. 193; Railroad Co. v. Newark, 25 N. J. Law 317; Railroad Co. v. Commissioners, 23 N. J. Law 510; State v. Love, 37 N. J. Law 60; Navigation Co. v. Berks County, 11 Pa. St. 202; Wayne County v. Canal Co., 15 Pa. St. 351. The statute in question violates the rule of uniformity, which is a part of the organic act. Norris v. Waco City, 57 Tex. 635; Ottawa County v. Nelson, 19 Kan. 234; New Orleans v. Kaufman, 29 La. Ann. 238; People v. Floating Dock Co., 63 How. Pr. 454; Gordon v. Cornes, 47 N. Y. 608; Stuart v. Palmer, 74 N. Y. 183. No property is beyond the reach of the taxing power of the state, unless designedly put beyond it by an unequivocal act of the sovereign power. Robertson v. Land Commisioners, 44 Mich. 274. When a corporation claims exemption from taxation it must show that the power to tax has been clearly relinquished. Railroad Co. v. Reed, 13 Wall. 266.

Heber McHugh and E. W. Camp, for respondent Foster County.

The "Gross Earnings Law" is invalid. If the parts of a statute are so mutually connected with and dependent upon each other, as conditions, considerations or compensations for each other, as to warrant the belief that the legislature intended them as a whole, and that if all could not be carried into effect, the legislature would not have passed the residue independently, then if some parts are unconstitutional, all the provisions which are thus dependent, conditional or connected, must fall with them. Cooley, Const. Lim., pp. 216, 217; Warren v. Mayor, 2 Gray 99; Allen v. City of Louisiana, 103 U. S. 80; Slauson v. Racine, 13 Wis. 398; State v. Commisioners, 5 Ohio St. 497; O'Brien v. Kreuz, 30 N. W. Rep. 458; State v. Harris, 8 Pac. Rep. 462; State v. Pugh, 1 N. E. Rep. 439; Meyer v. Berlandi, 40 N. Rep. 513; Virginia Coupon Cases, 114 U. S. 270. A statute which

is in part invalid must be held to be wholly invalid unless the parts
—that which is constitutional and that which is unconstitutional
—are capable of separation, so that each may be read by itself.
Baldwin v. Franks, 120 U. S. 678; United States v. Reese, 92 U. S.
214; Keokuk v. Keokuk, 95 U. S. 80; Trade Mark Cases, 100 U. S.
82; United States v. Harris, 106 U. S. 629. The "Gross Earnings
Law" (if valid at all), does not, properly construed, exempt
from taxation the lands in question. Bailey v. Magwire, 22
Wall. 215; Desty on Taxation, p. 108; Cooley on Taxation, pp.
54, 152; People v. Railroad Co., 119 Ill. 83; Appellant v. Irwin,
72 Ill. 452; Cook v. State, 33 N. J. Law 474. See also, State v.
Railroad Co., 32 Minn. 294; County of Ramsey v. Railroad Co.,
33 Minn. 537; State v. Railroad Co., 38 N. W. Rep. 635; Rail-
road Co. v. City of St. Paul, 38 N. W. Rep. 925; Railroad Co. v.
Neary, 8 Atl. Rep. 363. The law is not an exemption law, but a
scheme for commuting taxes, and the so-called exemption is only
co-extensive with the property which produces the earnings.
Railroad Co. v. Supervisors, 29 Wis. 116; Gardner v. State, 21
N. J. Law 557; County of Todd v. Railroad Co., 36 N. W. Rep.
109; Tucker v. Ferguson, 22 Wall. 575. Railroad property con-
stitutes a class, and the state may exempt, or commute the taxes
on such property, but the marks of distinction on which classi-
fication is founded must be such in the nature of things, as will
in some reasonable degree account for or justify the restriction
of the legislature. State v. Hammer, 42 N. J. Law 435; Nichols
v. Walter, 33 N. W. Rep. 800; Lavallee v. Railroad Co., 41 N.
W. Rep. 974; New Orleans v. Fourchy, 30 La. Ann. 910. Class-
ification of property for taxation must be based upon the nature
and use of the property itself. State v. Taylor, 11 Atl. Rep.
321; Town v. Banks, 2 S. W. Rep. 852; Davies v. Gaines, 3 S.
W. Rep. 184; State v. Duryea, 6 Atl. Rep. 524; State Board v.
State, 4 Atl. Rep. 578; Graham v. Chatauqua Co., 2 Pac. Rep.
549; Lassen Co. v. Cone, 14 Pac. Rep. 100. To construe the law
as exempting these lands from taxation would bring the law into
conflict with the 14th amendment to the federal constitution.
Santa Clara Co. v. Railroad Co., 18 Fed. Rep. 396; Railroad
Co. v. Cailand, 3 Pac. Rep. 134; San Mateo Case, 13 Fed. Rep.
722.

The counties are not estopped from asserting the taxability of the lands by reason of having received and retained part of the moneys paid by plaintiff to the territorial treasurer under the gross earnings law:    First, because the act of the plaintiff in paying such moneys was not induced or influenced by any act of the counties.   Bigelow on Estoppel, p. 620;  Parliman v. Young, 4 N. W. Rep. 139; Maxwell v. Bridge Co., 46 Mich. 278; Ketchum v. Duncan, 96 U. S. 659;. Petring v. Dry Goods Co., 3 S. W. Rep. 405;  Warden v. Baker, 11 N. W. Rep. 342; Brant v. Virginia Co., 3 Otto 326.    Second, because the principle of estoppel can be invoked only in aid of justice.   DeMill v. Moffat, 49 Mich. 25; Gull River Lumber Co. v. Keefe, 41 N. W. Rep. 743;  Company v. Trustees, 35 N. J. Eq. 181.    Third, because in the payment and receipt of the moneys there was no privity between the plaintiff and the counties.   Hoople v. Hipple, 33 Ohio St. 116;  Mayenborg v. Haynes, 50 N. Y. 675; Deery's Lessee v. Cray, 5 Wall. 795.   Fourth, because a public corporation can never be estopped from alleging the invalidity of a law or its own absolute want of power.    Snyder v. Studebaker, 19 Ind. 462;  Mattox v. Hightshue, 39 Ind. 95;  Counterman v. Dublin, 38 Ohio St. 515;  South Ottawa v. Perkins, 4 Otto 260; Parkersburg v. Brown, 106 U. S. 608; Bank v. Porter, 110 U. S. 608;  Dixon Co. v. Field, 111 U. S. 83;  McPherson v. Foster, 43 Iowa, 48;  Hopple v. Brown Township, 13 Ohio St. 311.

The errors and irregularities in the tax proceedings furnish no ground for injunction.    South Platte Land Co. v. Crete, 7 N. W. Rep. 859;  Burt v. Wadsworth, 39 Mich. 126;  Otoe v. Mathews, 25 N. W. Rep. 618;  Otoe v. Brown, 20 N. W. Rep. 274, 641.    For a discussion of the principles on which equity proceeds in cases like the present, see Chicago v. Frary, 22 Ill. 34; Albany v. Auditor, 37 Mich. 391; Wood v. Helmer, 10 Neb. 65;  Warden v. Commissioners, 14 Wis. 618;  Frost v. Flick, 1 Dak. 131.    The fact that the various species of taxes were not carried out in separate columns would be no ground for injunction.   Railroad Co. v. Commissioners, 11 N. W. Rep. 332; Wall v. Trumbull, 16 Mich. 228;  Torrye v. Milbury, 21 Pick. 64; George v. Dean, 47 Tex. 73;  Downing v. Roberts, 21 Vt. 441;

Henry v. Chester, 15 Vt. 460.    Even the assessment of several lots at a gross sum, where no fraud is alleged or injury shown, is no reason for setting aside the assessment.    State v. Taylor, 35 N. J. Law 184; Dundy v. Commissioners, 1 N. W. Rep. 565. Nor is assessment to the wrong person.    Conway v. Younkin, 28 Iowa 295.    Nor assessment after the time limited by law. Woodman v. Ely, 2 Fed. Rep. 839. The power of the treasurer to sell is derived from the statute itself and it matters not whether the tax warrant was issued by the commissioners. or not.    Railroad Co. v. Carroll County, 41 Iowa 153; Parker v. Sexton, 29 Iowa 421; Johnson v. Chase, 30 Iowa 308; Snell v. City of Fort Dodge, 45 Iowa 564; Company v. Dean, 41 N. W. Rep. 504.    The plaintiff must tender the amount of the tax in order to have the sale enjoined.    Stetson v. Freeman, 14 Pac. Rep. 256; Belz v. Bird, 1 Pac. Rep. 246; Bank v. Lewis, 2 So. Rep. 243 ; Wartensleben v. Haithcock, 1 So. Rep. 38; Alexander v. Merrick, 13 N. E. Rep. 190; Dillon v. Merriam, 34 N. W. Rep. 344; Hershy v. Thompson, 8 S. W. Rep. 689; Gage v. Caraher, 17 N. E. Rep. 777; Morrison v. Jacoby, 14 N. E. Rep. 546; State v. Casteel, 11 N. E. Rep. 219; Rowe v. Peabody, 1 N. E. Rep. 353; Knox v. Dunn, 22 Kan. 683.

The opinion of the court was delivered by

WINCHESTER, J.    This action was brought by the appellant in September, 1888, to restrain the respondent, as county treasurer of McLean county, from selling certain lands in said county, and described in the amended complaint, for taxes. levied and assessed thereon in the year 1887, amounting to $4,803. The respondent demurs to the appellant's bill, upon the ground that said bill did not state facts sufficient to constitute a cause of action. The demurrer was sustained by the lower court and the action was dismissed. Judgment was duly entered by respondent against appellant, and from this judgment the present appeal was taken by the appellant.

The sole question we have to consider is whether the complaint states facts sufficient to constitute a cause of action. The complaint avers that the appellant is a corporation organized under the act of congress approved July 2, 1864, entitled "An

act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget's sound on the Pacific coast, by the northern route," and under certain subsequent acts and joint resolutions of congress relating to the same subject matter; that, in pursuance of said act of July 2, 1864, and the subsequent acts and joint resolutions of congress, appellant has constructed a line of railroad and telegraph in all respects as required by said acts and joint resolutions, and is now engaged in operating the same; that said railroad and telegraph line has been duly accepted by the United States, as provided for in said acts and joint resolutions, and is in all respects of the material and character specified and required therein; that the line of said road was definitely fixed, and a plat thereof filed in the office of commissioner of the general land office at Washington, D. C., on May 26, 1873; that at all times prior to this date the lands described in the complaint were free from pre-emption or other claims or rights, and had not been sold, granted, reserved, or otherwise appropriated by the United States, and were a part of the public domain of the United States; that said lands were and are situated within either the "place" or "indemnity" limits of the appellant's grant; and that, by reason of the facts above stated, appellant has acquired all the interest in said lands conferred and intended to be conferred by the acts of congress aforesaid. The complaint further alleges that in 1887 the taxing officers of McLean county levied certain taxes on said lands for that year for territorial, county, and other purposes, amounting in the aggregate to the sum of $4,803; that said taxes were and are illegal and void by virtue of the act of March 9, 1883, which provides that, in lieu of all other taxation upon the property of railroad companies, there should thereafter be paid a certain percentage of the gross earnings of such railroad companies; that said act of March 9, 1883, has in all respects been complied with by appellant; and that, notwithstanding these facts, the respondent threatens to sell the said lands to satisfy said taxes, and will do so unless enjoined by the court. The complaint prays for a permanent injunction enjoining such threatened sale.

A court of equity will not interfere, except upon the strongest and most cogent reasons, with the collection of the public revenue. The taxing power of the government has very wisely been delegated to the legislative department, and must necessarily be exercised by that body without interference by any other governmental department. It is true that the legislative, executive, and judicial departments of government are co-ordinate and equal, but it is also true that none of these departments will interfere with any of the other departments unless the person asking for such interference can show that the governmental department whose action is questioned has clearly exceeded its powers, and usurped an authority or power not properly belonging to it. In the case at bar this court is asked to interfere with the usual and ordinary method of procedure of collecting the revenues of the territory of Dakota by enjoining the respondent from selling appellant's lands to satisfy taxes assessed thereon by the proper governmental officers, and which said taxes have, it is conceded, not been paid. This method of procedure has been prescribed by the legislature of Dakota territory in pursuance of a power vested in it by the organic act creating the territory. By that act the legislature of the territory was given by congress full and complete power and authority over all rightful subjects of legislation, subject only to the limitation that the exercise of such power should not conflict either with the federal constitution or the laws of congress passed in pursuance thereof, or the provisions of the organic act itself. 12 U. S. St. at Large, p. 241; Rev. St. U. S. § 1925. By virtue of this grant of power to the territory the taxing power became vested in the territorial legislature, and could be exercised by that body in any manner that it saw fit, subject only to the limitations and restrictions above indicated. The power to tax is a legislative power, which acknowledges no other limitations than those prescribed in the paramount law of the land, and this vast power undoubtedly passed to and was vested in the legislature of Dakota territory by virtue of the provisions of the organic act, under which that territory was formed, and which extended the power and authority of that body to "all rightful subjects of legislation." McCulloch v.

Maryland, 4 Wheat. 415; Bank v. Billings, 4 Pet. 514; State v. Lancaster Co., 4 Neb. 540; Cooley, Tax'n (2d Ed.) c. 2, passim. And, as the actions which are complained of in this case, and against which relief is sought, resulted directly from and flow out of the exercise by the territorial legislature of a power that was unquestionably reposed in it by the organic act, the judicial department of the government cannot and will not interfere unless it clearly appears that either the legislative department has exceeded its power, or that the regularly constituted officers of the territorial government have usurped powers or functions not properly belonging to them, and in carrying out such usurpation will inflict irreparable injury and damage to the appellant.

It appears from the complaint that appellant's lands have been assessed for taxation for the year 1887, and that, as the appellant has refused to pay the taxes so assessed, the respondent threatens to and will sell said lands to satisfy said taxes, unless enjoined by this court. It is admitted that, if the gross earnings law of 1883, hereinafter referred to (Sess. Laws 1883, c. 99), is a valid and constitutional law, and exempts the property in question from taxation, the threatened action of respondent is unlawful. But this conceded fact would not, of itself, entitle appellant to invoke the aid of a court of equity. It is necessary that some additional facts be shown, so as to bring the case under some acknowledged head of equity jurisprudence. Cooley, Tax'n, 760. The case at bar shows such additional facts by reason of the provisions of § 67 of chapter 28 of the Political Code of Dakota territory, which enacts, in substance, that the purchaser of any tract of land sold for taxes shall be entitled to a certificate of sale, describing the land so sold, the sum paid, and the time when the purchaser will be entitled to a deed, and which shall be assignable, "and shall be presumptive evidence of the regularity of all prior proceedings." It is unquestionably true that the issuance of this certificate creates a cloud upon the title to the land described therein, as said certificate is *prima facie* evidence, by the express terms of the statute, of the regularity of all prior proceedings, including the taxability of the lands. It follows that the case at bar presents

sufficient ground to warrant the interference of a court of equity by the extraordinary writ of injunction, if it can be shown that the lands in question were not subject to taxation. The doctrine is well settled that a court of equity will grant proper relief in tax proceedings, in order to prevent the casting of a cloud upon the title of the complainant's land. Cooley, Tax'n, 779; Railroad Co. v. Cheyenne, 113 U. S. 516, 5 Sup. Ct. Rep. 601; Hannewinkle v. Georgetown, 15 Wall. 547; Dows v. Chicago, 11 Wall. 108; State Railroad Tax Cases, 92 U. S. 575; Oil Co. v. Palmer, 20 Minn. 468 (Gil. 424;) Dean v. Madison, 9 Wis. 402; Crooke v. Andrews, 40 N. Y. 547. In the case at bar the court will grant appropriate relief, by injunction or otherwise, if it appear that the lands in question have been unlawfully taxed.

The appellant has urged with great earnestness that the various defects in the levy and assessment of the taxes upon its lands, specified in the complaint, rendered such taxes void *in toto*, and warranted a court of equity in interfering by injunction to stop the sale of said lands to satisfy such void taxes. In the view we take of the case, it is not necessary to consider this point.

The main argument of appellant is that the lands in question were exempt from taxation by virtue of the "gross earnings law" (so called) of 1883. The respondent contends—*First*, that this statute does not exempt the lands in question from taxation; and, *secondly*, that it is unconstitutional. The first point made by respondent must be disposed of before passing to the questions of constitutional law raised; and in order to properly dispose of this point, it will be necessary to briefly review the legislation of Dakota territory in respect of the taxation of railroad companies. Prior to 1879, the property of railroad companies in the then territory of Dakota was taxed in the same manner as other taxable property. In that year the first gross earnings law was passed. Sess. Laws, 1879, c. 46, p. 122. This law specifically provided that the percentage of gross earnings to be paid by railroad companies in pursuance of its provisions should "be in lieu of all other taxation * * * of the roadbed, right of way, station or depot grounds, tracks, rolling stock,

water stations, water tanks, turn tables, engine house, machine shops, depots, and necessary buildings, tools, machinery, materials for repairs, gravel beds, furniture, telegraph instruments and lines, and fuel of such railroad corporation, used in or incident to the operation of such railroad.    All property of railroads not above enumerated, subject to taxation shall be treated in all respects, in regard to assessment, equalization, and taxation, the same as similar property belonging to individuals, whether said lands are received from the general government or from other sources." This provision expressly limits the exemption to property actually used in the operation of railroads. But the act of 1883 (Sess. Laws, 1883, c. 99, p. 211), goes further.    The first section of this act is as follows: "In lieu of any and all other taxes upon any railroad, except railroad operated by horse-power, within this territory, or upon the equipments, appurtenances, or appendages thereof, or upon any other property situated in this territory, belonging to the corporation owning or operating such rairoads, or upon the capital stock or business transaction of such railroad company, there shall hereafter be paid into the treasury of this territory a percentage of all the gross earnings of the corporation owning or operating such railroad, arising from the operation of such railroad as shall be situated within this territory, as hereinafter stated; that is to say: Every such railroad corporation or persons operating a railroad in this territory shall pay to said treasurer each year for the first five years after said railroad shall be or shall have been operated in whole or in part, two (2) per centum of such gross earnings; and for and in each and every year after the expiration of the said five years, three (3) per centum of the gross earnings; and the payment of such per centum annually as aforesaid, shall be and is in full of all taxation and assessments whatever upon the property aforesaid.    The said property shall be made one-half ($\frac{1}{2}$) on or before the fifteenth day of February, and one-half ($\frac{1}{2}$) on or before the fifteenth day of August in each year; and for the purpose of ascertaining the gross earnings aforesaid an accurate account of such earnings shall be kept by such company. An abstract thereof shall be furnished by said company to the treasurer of this territory on or before the first (1) day of Feb-

ruary in each year, the truth of which abstracts shall be verified by the affidavits of the secretary and treasurer of said company; and for the purpose of ascertaining the truth of such affidavits and the correctness of such abstracts, full power is hereby vested in the governor of this territory, or any other person appointed by law, to examine under oath the officers and employes of said company or other persons; and, if any person so examined by the governor or other person shall knowingly or willfully swear falsely concerning the matters aforesaid, every such person is declared to have committed perjury. And for the purpose of securing to the territory the payment of the aforesaid per centum it is hereby declared that the territory shall have a lien upon the railroads of said company, and upon all property, estate, and effects of said company whatsoever, personal, real, or mixed, and the lien hereby secured to the territory shall have and take procedure of all demands, decrees, and judgements against said company." Sections 2, 3 and 4 provide the machinery whereby the tax upon the gross earnings of railroad companies shall be collected in case such railroad companies fail to pay the same. Section 5 reads as follows: "The lands of any railroad company shall become subject to taxation in the same manner as other similar property, as soon as the same are sold, leased, or contracted to be sold or leased; and on or before the first day of April of each year each railroad company having lands within this territory shall return to the county clerk of each county full and complete lists, verified by the affidavit of some officer of the company having knowledge of the facts, and of all lands of such company situated in said county sold or contracted to be sold or leased during the year ending the last day of December preceding; and the list furnished on or before the first day of April, A. D. 1883, and in compliance with the terms of this section, shall include a complete list of all lands sold or leased or contracted to be sold or leased prior to the last day of December, A. D. 1882." Sections 6, 7 and 8 are not material in this case.

There is a radical difference between the acts of 1879 and 1883 in respect of the property exempted from taxation. The act of 1879, by its express terms, limited the exemption only to

such property as was actually used in the operation of the railroad. The act of 1883 not only changes the description of the property exempted, but also, by § 5, above quoted, seems to express a clear intention upon the part of the legislature passing said act to exempt from taxation the land grant of appellant and any other railroad company that might have lands of similar character within the then territory of Dakota. If the legislature did not intend to create a greater exemption by the law of 1883 than had previously existed under the law of 1879, then it is difficult to perceive the reason for the change of the phraseology of the latter statute from that of the former, and, indeed, to understand why the latter statute was even enacted into a law. The language of the statute of 1883 is much broader in its scope than that of the law of 1879. It excepts from taxation the "capital stock" of railroad companies. The use of this descriptive term shows an intent upon the part of the legislature to exempt all property actually used in railroad operation. All the property of a railroad company devoted to such use is necessarily represented by its "capital stock;" and it has repeatedly been held that where a statute exempts such "capital stock" from taxation this exemption includes all the real estate, rolling stock, and other property actually and necessarily used in the operation of such railroad. Scotland Co. v. Missouri, etc., R. Co., 65 Mo. 123; Railroad Co. v. Shacklett, 30 Mo. 550; Baltimore v. Railroad Co., 6 Gill, 288; Railroad Co. v. Mayor, 14 Ga. 275; New Haven v. City Bank, 31 Conn. 106; Commissioners v. Railroad Co., 47 Md. 592; Bibb Co. v. Banking Co., 40 Ga. 646; Bank Tax Case, 2 Wall. 200. The statute under consideration, however, goes further. It exempts the "business transactions" of railroads, and also their "equipment," "appurtenances," and "appendages," and adds that any other property shall be exempt. It is unnecessary for us to determine whether this broad and comprehensive description of the property that was to be exempt under the law of 1883 includes the land grant of appellant. It is sufficient to say that, whatever doubt may exist upon the point, that doubt is clearly resolved when we consider § 5 of the law, unless, indeed, we eliminate this section altogether from the statute. This, of

course, cannot be done. The principle is elementary that in construing a statute every word must, if possible, be given some force and effect. It is also elementary that a later statute may be construed by reference to a prior statute relating to the same subject matter. Section 5 of the act of 1883 provides in terms that "the lands of any railroad company shall become subject to taxation in the same manner as other similar property, as soon as the same are sold, leased, or contracted to be sold or leased." The lands involved in this case have not been sold or leased or contracted to be sold or leased by appellant. Section 5, therefore, is tantamount to an express declaration that prior to such selling or leasing, or such contracting to sell or lease, such lands shall not be taxable. As stated in the case of Railroad Co. v. Shacklett, 30 Mo. 559, 560, "when the legislature declared that at a certain period property shall be taxed, it is, in effect, a declaration that prior to the designated time it shall not be taxed." When, therefore, the language used in the law of 1883 in describing the property exempted, together with § 5 of the act, is considered in conjunction with the prior statute of 1879, the conclusion is irresistable that the legislature, in enacting the law of 1883, intended thereby to exempt not only property actually used in the operation of railroads, but also all other property lawfully owned by such companies. It cannot be questioned that in passing the law of 1883 the legislature intended to exempt appellant's land grant from taxation in consideration of the payment by it of the percentage of its gross earnings specified in said law.

The gross earnings law is also attacked by respondent upon constitutional grounds. It is argued that the act contravenes § 6 of the organic act of the territory, which is as follows: "And be it further enacted, that the legislative power of the territory shall extend to all rightful subjects of legislation consistent with the constitution of the United States and the provisions of this act; but no law shall be passed interfering with the primary disposal of the soil. No tax shall be imposed upon the property of the United States; nor shall the lands or other property of non-residents be taxed higher than the lands or other property of residents; nor shall any law be passed im-

pairing the rights of private property; nor shall any discrimination be made in taxing different kinds of property; but all property subject to taxation shall be in proportion to the value of the property taxed." 12 U. S. St. at Large, p. 241; Rev. St. U. S. § 1925. It is also urged that the law is unconstitutional because it violates the fourteenth amendment to the constitution of the United States. As we understand respondent's contention, all the grounds of objection to the statute, in substance, amount to this: That a railroad company, in respect of its land grant, is in precisely the same condition as any other owner of real estate, and therefore the territorial legislature had no power to classify railroad companies by themselves, and provide for a method of taxing their land grants different from that provided for taxing the other lands in the territory. It is claimed that the placing of railroads in a class by themselves for purposes of taxation is, so far as railroad land grants are concerned, an arbitrary and unwarrantable classification, not justified either by any peculiar condition of circumstances of the land itself or the owners thereof. The taxing power is a legislative power, and passed to the territorial legislature by virtue of the general grant of legislative power made by congress in the organic act. The power resided in the legislature without any limitations or restrictions whatsoever upon its exercise, except such limitations as were imposed by the organic act itself and the federal constitution. As was said by Chief Justice MARSHALL in the famous case of McCulloch v. Maryland, 4 Wheat. 415, the power to tax is "an absolute power, which acknowledges no other limits than those expressly prescribed in the constitution." He adds that "it may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it." See, also, State v. Lancaster, 4 Neb. 540; Bank v. Billings, 4 Pet. 514; Cooley, Tax'n, c. 2. The only limitations, then, upon the exercise of the taxing power by the territorial legislature are such as were prescribed either by the organic act or the federal constitution.

We do not think that § 6, which is the only provision of the organic act relied on by respondent, has any bearing on the

case. The language is that "there shall be no discrimination in taxing different kinds of property, but all property subject to taxation shall be taxed in proportion to its value." This provision undoubtedly imposed a limitation upon the taxing power of the territorial legislature, but not of the kind contended for. In the apportionment of every tax it is requisite not only that the subjects to be taxed shall be selected, but also that the rule by which they shall contribute shall be determined. The territorial legislature had the power to determine both of these questions, except in so far as § 6 limited that power. It certainly cannot be doubted that the section did not limit the legislative power in respect of selecting the subjects of taxation. If it did, then it would have prevented the legislature from making any exceptions from taxation whatsoever, and have made it incumbent upon that body to tax all property in the territory which from its nature or character was susceptible of taxation. But it has never seriously been doubted that the legislature had the power to make such exemptions from taxation as it saw fit. The power has certainly been exercised, without question or objection, ever since the organization of the territory. Every revenue law has contained provisions exempting certain kinds and species of property, and it would be with great reluctance, and only upon the most cogent reasons that this court would, at this late day, cast doubts upon the validity of the exercise of a power that has so long been supposed to exist, and that has been exercised for more than 30 years without question or objection.

However, the question whether the territorial legislature had power to exempt any property from taxation is not, in our opinion, before the court, and it is not necessary to pass on that point. If it were necessary to do so, we would unhesitatingly say that the power to exempt existed in the territorial legislature; following upon this point, the case of Ferris v. Vannier, 6 Dak. 186, 42 N. W. Rep. 31, where the supreme court of Dakota territory held that the legislature had full power to make exemptions from taxation. In what way then does § 6 limit the legislative power in respect to taxation? We are of opinion that it only prevents unjust discrimination in taxing property

subject to taxation. But what property is "subject to taxation?" Obviously such property as the legislature has declared to be subject to taxation. Property not so declared to be subject to taxation is necessarily exempt from taxation, and the section cannot possibly have any relation to or bearing upon any such property. When the legislature delared and prescribed the subjects that should be taxed, § 6 became operative upon these selected subjects, and prohibited any unjust discrimination in taxing these subjects. It prohibited the taxing of one class or kind of these selected subjects upon one basis, and the taxing of another kind or class upon another basis, but made it imperative that all classes and kinds " should be taxed in proportion to their value." In the absence of the provision, the legislature would have had the power to prescribe one rule by which one class of selected subjects should contribute, and another and different rule by which another class should contribute, and would thus have had the power to make unjust discrimination in taxing different kinds of property. Section 6 was designed to prevent this by making one uniform, *ad valorem* rule, operating upon all property subject to taxation. It did not limit the power of the legislature to select the subjects, but it did operate upon those subjects as soon as they were selected. Prior to the selection the provision was dead; as soon as the selection was made it sprang at once into life, and attached itself to these selected subjects. This is the construction placed on the provision by the supreme court of Dakota territory in the case of Ferris v. Vannier, 6 Dak. 186, 42 N. W. Rep. 31, where TRIPP, C. J., said: "Congress has prohibited discrimination, which must be construed to mean unjust discrimination—a discrimination in favor of one kind of property as against another; a discrimination which prevents each kind of property subject to taxation from bearing its fair and equal share of the burden imposed on all. In this sense the words are aptly chosen; in any other they are meaningless and lead to absurd results. Under this construction we are free from many perplexities in which courts have found themselves in determining whether laws which were not discriminating were uniform. The disjunctive clause with which this provision is connected further limits and explains it.

Standing alone it might be construed to mean that all property of every kind must be taxed equally without discrimination; but the words 'subject to taxation,' limiting the words and clause of which they form a part, extend their limiting power to the principal clause which the disjunctive clause itself limits, so that the meaning of both construed together, is that there shall be no unjust discrimination in the taxation of the different kinds of property subject to taxation, but all such property shall be taxed in proportion to its value. These words, 'subject to taxation,' are of importance in the construction of this section. Without them, all property would be subject to taxation; with them, only certain property is liable to taxation. Who is to determine what property is 'subject to taxation?' The courts cannot determine. It is a legislative function. It can only be exercised by the legislature or by congress. Congress has not seen fit to exercise it, but has given to the legislature the absolute control over 'all rightful subjects of legislation,' saving and reserving to itself alone the right to modify it or annul the same. This certainly is a rightful subject of legislation, and it follows that congress has given to the legislature the right to apportion and subject property to taxation. The legislature, then, has a right to say what property shall be subject, and what property shall not be subject, to taxation; what property shall be taxed, and what property shall be exempt from taxation—limited only by the provision that all property so subject to taxation shall be taxed without unjust discrimination in favor of one kind of property as against another, so that every kind of such property shall be taxed in proportion to its value." This decision established beyond doubt two propositions, viz: (1) That the territorial legislature had full and plenary power to select the subjects of taxation; and (2) that § 6 became operative only upon such selected subjects, and was absolutely of no effect in respect of property not selected for taxation. As the property of railroad companies was not selected for taxation, but on the contrary, was exempted by the statute of 1883, it follows that the statute of 1883 is not, so far as its constitutionality is concerned, affected by § 6 of the organic act. That section has no bearing whatsoever upon the question raised. It was in-

tended to apply only to property declared to be taxable; and, as railroad property is, by the express terms of the act of 1883, exempt from taxation, the provision is immaterial.

The conclusion that we have reached upon this branch of the case is in accordance with the opinions of every court that has been called upon to pass upon a similar question. The supreme court of Wisconsin, in the case of Railroad Co. v. Taylor Co., 52 Wis. 37, 8 N. W. Rep. 833, was called upon to determine whether a law exempting the land grant of the Wisconsin Central Company from taxation in consideration of a percentage of the company's gross earnings was constitutional or not. The constitutional provision relied upon by the defendant (Taylor county) was that "the rule of taxation shall be uniform, and taxes shall be levied upon such property as the legislature shall prescribe;" and the defendant argued that this provision prohibited the legislature from exempting from taxation the lands granted to railroad companies to aid in the construction of their lines. But the court held that the provision of the constitution was applicable only to such property as was declared to be taxable, and that, as the property of the company was expressly declared to be exempt, the provision was inoperative. We quote at considerable length from the opinion, as the case is, perhaps, the leading one upon this point. CASSODAY, J., in delivering the opinion of the court, said: "Since the legislature are to 'prescribe' the 'property' which must bear the burden of taxation, it follows as a logical sequence that the balance of the property in the state, and which is not so 'prescribed,' must necessarily be exempt from taxation. It is only upon the property so prescribed or designated by the legislature that the rule of uniformity can have any application. It clearly cannot apply to property not prescribed, and which would therefore be exempt. But the right of the legislature to prescribe what property shall be taxed includes the right to prescribe what property shall not be taxed. The right of choosing some from the multiplicity of kinds, classes, species, use, and ownership of property in the state, and the rejection of others, includes the absolute power to discriminate between what shall be chosen and what rejected, except in so far as it may be limited by the re-

quirement of a uniform rule. But what is to be the standard of the rule? The constitution simply defines it as 'the rule of taxation.' As stated in one of the cases cited, this provision of the constitution does not execute itself. It does not say that 'all lands,' etc., 'shall be taxed equally and uniformly.' It simply requires that the rules of taxation shall be 'uniform.' But who makes the rule that is thus to be uniform? Was it made by the constitutional convention, or was it left for the legislature? Most of the constitutions referred to, where the word 'uniform' has been used, have directly or indirectly applied it to property named therein, or valuation, or rate, or taxes, or classes of subjects; but in our constitution it applies to none of these things, but simply to the 'rule of taxation.' What is this rule of taxation? Manifestly it is the act of levying a tax or imposing taxes on the subjects of the state by the legislative power of the state. It is the measure of individual duty in support of the public burdens, and the means of enforcing the same. The rule of taxation is the law of taxation. Such rule or law must be prescribed by the legislature, as well as the property to which it is to be made applicable. But the uniformity does not go directly to the property so prescribed, but only to the 'rule' or law by which contributions are enforced against the owners of such property. The uniformity reaches the property so designated by the legislature, but only through the 'rule' or law prescribed. As the uniformity could, through the rule or law, only reach such property as the legislature should designate as being subject to taxation, it is very evident that it never could reach property not so designated, and therefore exempt from taxation, and hence to which the rule could not apply. The legislature has the exclusive power to designate the property which shall be subject to taxation, and to prescribe a rule or law by which the owners of such property are forced to contribute to the public burden, limited only by the requirements that the rule so prescribed shall be uniform. Uniformity of rule is entirely different from uniformity of subjects to which the rule is applicable. Most general laws are uniform rules, but the diversities in the subjects to which they apply are innumerable. In determining just what the rule of

uniformity shall be in taxation, and how it shall be applied, there is a wide field of legislative discretion."

The constitution of Arkansas by article 7, § 2, tit. "Revenue" provides that "all property subject to taxation shall be taxed according to its value." This is quite similar to § 6 of the organic act of Dakota territory, and was construed in the case of State v. Crittenden Co., 19 Ark. 360. In this case, by act of congress of September 28, 1850, swamp and overflowed lands were granted to the state of Arkansas for certain specified purposes. Thereafter the legislature passed an act to provide for the reclamation of these lands. The fourteenth section of this act provided that "to encourage by all just means the progress and completion of the reclamation, by offering inducements to purchasers and contractors to take up said lands, the swamp and overflowed lands shall be declared exempt from taxation for the term of ten years, or until said lands shall be reclaimed." Subsequent to the passage of this statute, an additional act was passed, repealing it. Prior to the repeal, the lands had been sold to private purchasers, and after the repeal of the statute exempting them from taxation for ten years the assessor of Crittenden county assessed the lands for taxes. The purchasers refused to pay the tax, upon the grounds that the act creating the exemption constituted a contract between the state and the purchasers, and that this contract could not, under the federal constitution, be abrogated or impaired by subsequent legislation. On the part of the state it was contended that the act granting the exemption was unconstitutional and therefore created no contract between the state and the subsequent purchasers, because it was incompetent for the legislature to exempt swamp and overflowed lands from taxation so long as it taxed other lands. The contention of the purchasers of the lands was sustained, the court saying: "We declare the true rule of construction to be that the legislature has the power, under the constitution, to select the objects of taxation, and upon the exercise of this power there is no constitutional restriction. When the legislature has selected the objects, these restrictions attach as to the imposition of taxes upon them, and the end intended to be accomplished is equality and uniformity in the taxation of

all the property taxed, throughout the state, and not equality and uniformity throughout the state as to the whole of each or any particular species of property from which objects of taxation may have been selected. The restrictions relate to the valuation of the property taxed, and to the rate of taxation imposed. They require all the property selected for taxation to be taxed according to its value, and that the rate of taxation imposed shall not be fixed higher upon the property of one taxpayer than upon that of another, no matter whether the property be of the same or of different species; and when this equality of valuation and rate has been observed it necessarily follows that the taxation of the property taxed is equal and uniform." The principle announced in and established by this case has never since been questioned, and was adopted without discussion in the cases of Railroad Co. v. Berry, 41 Ark. 509; Railroad Co. v. Berry, 44 Ark. 17; Railroad Co. v. Parks, 32 Ark. 131; Railroad Co. v. Berry, 41 Ark. 436. In all these cases an exemption of railroad land grants in consideration of a payment of a certain specified percentage of gross earnings was recognized and decided to be valid.

In view of what we have before said it seems unnecessary to enter into any further discussion of the authorities bearing, either remotely or directly, upon the point under discussion. Our opinion is that, so far as the provisions of § 6 of the organic act are concerned, the legislature had full power and authority to enact the gross earnings law of 1883. In addition to the cases heretofore cited, we refer, without comment, to Stratton v. Collins, 43 N. J. Law 562; Mississippi Mills v. Cook, 56 Miss. 40; New Orleans v. Davidson, 30 La. Ann. 554; New Orleans v. Tourchy, Id 910; Crow v. State, 14 Mo. 237; Hamilton v. County Court, 15 Mo. 3; State v. North, 27 Mo. 465; Railroad Co. v. McLean Co., 17 Ill. 291—all of which cases fully support and sustain the views we have expressed.

There is nothing in the provisions of § 6 of the organic act which prohibited the legislature of Dakota territory from passing the law of 1883. As we have before said that section applied only to the second requisite of apportionment, and was intended to prescribe the rule by which the subjects selected

for taxation should contribute. As the property of railroad companies was expressly exempted from taxation by the law of 1883, it follows that § 6 does not refer to or have any bearing on this exempted property.

We must now consider whether the gross earnings law of 1883 is contrary to the provisions of the fourteenth amendment to the federal constitution, which provides that no state shall deny to any person within its jurisdiction "the equal protection of the laws." The respondent contends that, in so far as the lands granted by congress are concerned, the appellant, as owner, occupies exactly the same position as the farmer, settler, homesteader, pre-emptioner, or speculator occupies; that in respect of the ownership of the lands, the appellant, and every other property owner in the territory, occupies the same position; and that a law prescribing a different method of taxation for one of the constituent members of this general class from that prescribed for the taxation of another constituent member of the same class is void, under the fourteenth amendment to the federal constitution. In other words, it is denied that the territorial legislature had the power to place railroad companies in a class by themselves for the purpose of taxation. The law of 1883 unquestionably classifies these corporations by themselves, and seeks to tax them by a method and system far different from the method pursued in taxing the individual citizen or property owner. The question is, can this classification be sustained upon legal grounds? The fourteenth amendment does not prohibit classification by the legislatures of the several states and territories in respect of those subjects properly coming under the exercise of the legislative power. It permits the legislature to create one class of persons or property, subject to and controlled by one law, another class controlled by another law, and so on; the only limitation upon the power being that all the constituent members of the same class must be treated exactly alike. Discrimination between different classes is permitted, but discrimination between members of the same class is not permissible. It has never been doubted that for purposes of taxation persons pursuing certain trades or occupations could be put into classes by themselves, and be re-

quired to pay a special license tax for the privilege of pursuing their calling. Thus, it is very common for legislatures to classify saloon-keepers by themselves, and exact from them a special license tax. But, as a citizen or person, the saloon-keeper stands before the law exactly in the same position as the doctor, the lawyer, the merchant, and every other citizen. Yet the power of the legislature to pick him out from all the other citizens of diverse trades and occupations, and compel him to pay an extraordinary tax for the privilege of conducting his business, cannot be questioned. The only limitation on the power is that all saloon-keepers shall be taxed. And so every other trade and business may be taxed, if all the persons pursuing the same trade or occupation are treated alike.

This power of classification has been repeatedly recognized by the United States supreme court in cases arising after the adoption of the fourteenth amendment. We do not think it is necessary to enter into any extended consideration of these cases, as the principles announced in and established by them are now thoroughly familiar both to the bench and bar. But it may be of use to refer, briefly, to several of them, which seem to us to establish the principles that must govern our decision in this case. In Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. Rep. 357, a municipal ordinance prohibiting washing and ironing in public laundries, within defined territorial limits, between 10 o'clock in the evening and 6 in the morning, was held to be valid. This ordinance was evidently intended to operate against the Chinese in the city of San Francisco, but the court declared that, as it operated alike on all persons engaged in the same business within the same territory, it was not within the amendment. In Missouri v. Lewis, 101 U. S. 22, a statute prohibiting appeals to the supreme court of the state from certain designated counties in the state was held to be not obnoxious to the fourteenth amendment. In Hayes v. Missouri, 120 U. S. 68, 7 Sup. Ct. Rep. 350, a statute providing that in all capital cases, except in cities having a population of over 100,000 inhabitants, the state should be allowed eight peremptory challenges to jurors, and in such cities should be allowed fifteen, was held to be constitutional. In Dow v. Beidelman,

125 U. S. 680, 8 Sup. Ct. Rep. 1028, a statute of a state, classi-
fying its railroad corporations by the length of their lines, and
fixing a different maximum rate that might be charged for
transporting passengers by each class, was sustained. In Rail-
way Co. v. Mackey, 127 U. S. 205, 8 Sup. Ct. Rep. 1161, a stat-
ute making railway companies liable to a servant for injuries
received by the negligence of a fellow servant, was held not to
violate the amendment. In commenting upon these cases,
counsel for the appellant use the following language, which we
think fairly state the conclusions to be drawn from them:
"These decisions establish beyond dispute the principle that
the legislature may classify persons, and enact laws applicable
to each class, each law operating, in respect both of the privi-
leges conferred and the liabilities imposed, upon the members
of its particular class only, and not upon the members of any.
other class. They establish the further principle that railroad
corporations may be placed in a class by themselves, and be
subject to new and additional burdens and liabilities." No
other conclusion is possible in view of these cases, which, upon
the point now under discussion, are binding upon this court.
Indeed, the power to classify railroads for purposes of taxation
was expressly recognized in the Kentucky Railroad Tax Case,
115 U. S. 321, 6 Sup. Ct. Rep. 57, where a statute was upheld
which provided a different method for ascertaining the value
of railroad property from that provided for other property.

· The power to classify railroads, banks, and other corpora-
tions for purposes of taxation, and to accept from them,
in lieu of the customary taxes, a specified percentage of
their gross earnings, has over and over again been affirmed,
and cannot now be questioned. 1 Desty, Tax'n, 145; Cooley,
Tax'n, 69; Bank v. Knoop, 16 How. 369; Dodge v. Wool-
sey, 18 How. 331; Bank v. Skelley, 1 Black 436; Dela-
ware Railroad Tax, 18 Wall. 206; Daughdrill v. Insurance Co.,
31 Ala. 91; State v. Railroad Co., 45 Md. 361; Worth v. Rail-
road Co., 89 N. C. 291; Wright v. Sill, 2 Black 544; Gardner v.
State, 21 N. J. Law 557; State v. Commissioner, 37 N. J. Law
240; State Lottery Co. v. New Orleans, 24 La. Ann. 86; LeRoy v.
Railroad Co., 18 Mich. 233; St. Louis v. Bank, 49 Mo. 574;

Farmers' Bank v. Com., 6 Bush 127; Mobile v. Insurance Co., 53 Ala. 570; Railroad Co. v. Taylor Co., 52 Wis. 37, 8 N. W. Rep. 833. And the supreme court of this state, in the recent case of Trust Co. v. Whithed, *ante*, held that the power to classify was extensive enough to permit the legislature to enact a statute exempting building and loan associations from the operation of the usury laws. As the reasoning upon which this conclusion was based applies particularly to the case at bar, we quote at some length from the opinion of BARTHOLOMEW, J., speaking for the court, who said: "This is a case which requires implicit adherence to that well established rule which requires courts to respect and enfore the will of the legislature, unless there has been a clear and unequivocal violation of the fundamental law of the state. 'A statute relating to persons or things as a class is a general law; one relating to particular persons or things of a class is special.' Suth. St. Const. § 121. 'Special laws are those made for individual cases, or for less than a class, requiring laws appropriate to its particular condition and circumstances.'" Id § 127. An inspection of the statute under consideration at once discloses that it does not come within the above definition of a special law. Nor does it grant any privileges or immunities to any citizen that would not equally extend to any other citizen coming within the class to which the exception applies. It is a statute general in form and general in its nature. If its operation be in any manner special, or if it grant privileges or immunities to any citizen or class of citizens that are not granted to all, it is because the statute is not literally uniform in its operation; and it becomes important to determine whether this lack of uniformity is of such a character as to violate the constitutional provision requiring all laws of a general nature to have a uniform operation. This provision is found in the constitution of a number of the states, and it has been before the courts in a large number of cases; and it has also been held that this provision was intended to prevent the granting to any citizen or class of citizens of privileges or immunities which, upon the same terms, should not belong to all citizens. McGill v. State, 34 Ohio St. 237; Suth. St. Const. c. 121; French v. Teschemacher, 24 Cal.

544. A 'general law,' as the term is used in this constitutional provision, is a public law of universal interest to the people of the state, and embracing within its provisions all the citizens of the state, or all of a certain class or certain classes of citizens. It must relate to persons and things as a class, and not to particular persons or things of a class. It must embrace the whole subject, or a whole class, and must not be restricted to any particular locality within the state. Cass v. Dillon, 2 Ohio St. 607; Kelley v. State, 6 Ohio St. 269; Wheeler v. Philadelphia, 77 Pa. St. 338; State v. Wilcox, 45 Mo. 458; State v. Parsons, 40 N. J. Law 123; *In re* Boyle, 9 Wis. 240; McGill v. State, 34 Ohio St. 237. The uniform operation required by this provision does not mean universal operation. A general law may be constitutional and yet operate in fact only upon a very limited number of persons or things, or within a limited territory. But, so far as it is operative, its burdens and its benefits must bear alike upon all persons and things upon which it does operate; and the statute must contain no provision that would exclude or impede this uniform operation upon all citizens, or all subjects and places, within the state, provided they were brought within the relations and circumstances specified in the act. McGill v. State, 34 Ohio St. 246; Smith v. Judge, 17 Cal. 554; Darling v. Rogers, 7 Kan. 592; Leavenworth Co. v. Miller, Id 479; Groesch v. State, 42 Ind. 547; Heanley v. State, 74 Ind. 99; State v. Wilcox, 45 Mo. 458; People v. Wright, 70 Ill. 398; McAunich v. Railroad Co., 20 Iowa 338; Humes v. Railroad Co., 82 Mo. 221; Railway Co. v. Iowa, 94 U. S. 155. From the foregoing propositions it follows of necessity that the legislature has power to classify persons and subjects for the purpose of legislation and to enact laws applying specially to such classes; and, while the laws thus enacted operate uniformly upon all members of the class, they are not vulnerable to the constitutional inhibition under consideration. But this power of the legislature is circumscribed. It is not an arbitrary power, waiting the whim or the will of the legislature. Its exercise must always be within the limits of reason, and of a necessity more or less pronounced. Classification must be based upon such differences in situation,

constitution, or purposes, between the persons or things included in the class and those excluded therefrom, as fairly and naturally suggest the propriety of and necessity for different or exclusive legislation in the line of the statute in which the classification appears. State v. Hammer, 42 N. J. Law 439; Nichols v. Walter, 37 Minn. 264, 33 N. W. Rep. 800; Board v. Buck, 51 N. J. Law 155, 16 Atl. Rep. 698; Railway Co. v. Markley, 45 N. J. Eq. 139, 16 Atl. Rep. 436; Miller v. Kister, 68 Cal. 142, 8 Pac. Rep. 813; City of Reading v. Savage, 124 Pa. St. 328, 16 Atl. Rep. 788; Hanlon v. Board, 53 Ind. 123; State v. Reitz, 62 Ind. 159. The application of these principles to the case before us will advance us towards a correct conclusion. By § 11, above quoted, our legislature placed building and loan associations, incorporated under the laws of this state, in a separate class, and exempted them from the operation of the usury law. Is this such a classification as the legislature had authority to make ? The business of money-loaning has its representatives in every community. The almost universal object of the lender is to increase his capital by such sums as the business indiscretion of his neighbors may permit, or their necessities compel them to pay for the use of the money loaned to them. To check the rapacity of capital, and to prevent unconscionable advantage being taken of mismanagement, misfortune, or inexperience, governments, in the exercise of their police power, have seen proper to place a limit upon the amount that may be charged for the use of money, and thus to compel the capitalist to deal with his less fortunate fellowmen in a spirit of fairness and liberality. But the theory and purpose of building and loan associations are entirely different. These associations are, presumably at least, composed of men who are not capitalists, but who desire to form a fund from their mutual earnings, that shall be mutually beneficial. To this end the persons subscribing for the stock of these associations agree to pay therefor in small amounts, at stated intervals, and to continue such payments until the amounts so paid, added to the profits that may be realized on the stock, equal its par value; and provisions are made for fines and forfeitures in case of non-payment. The stock is issued in one series, or in

successive series, and all the stock of any one series, which has not been forfeited, will reach par at the same time, and the purposes of the association as to such stock will then be at an end, and the assets will be distributed and the association dissolved. The fund so accumulated is, primarily, for the use of the stockholders. In the absence of express statutory authority, a building and loan association cannot loan its money outside of its own members. End. Bldg. Ass'ns. 312; Wolback v. Association, 84 Pa. St. 211. Neither can a loan be made to a stockholder in excess of the par value of his stock. When a certain amount (not less than the par value of one share of stock) is accumulated, the money is put up for sale, usually termed 'auction,' and that member who is willing to pay the highest premium, or who is willing to have the largest amount deducted, where a premium is deducted from the loan, receives a loan equal to the par value of the stock held by such party, and assigns his stock to the corporation as collateral security. But his duty to continue his payments upon his stock is not changed, and should he fail in that duty, his stock would become forfeited. Hence he is also required to execute his note for the loan, with mortgage security, and generally to pay interest on the amount until the note is paid. No definite date for payment is fixed. In theory, and generally in practice, the time of payment arrives when the stock reaches par, and the corporation, as to such stock, ceases to exist, and the member receives as his share of the assets his own note and mortgage. Under our statute, the member has the right to pay his note at any time and thus stop the interest; and in that case would, of course, be entitled, on the dissolution of the corporation, to receive the value of his stock in cash. But the effect of the transaction, generally speaking, is simply this: The association uses the fund to purchase the stock of that member who is willing to sell his stock in advance for the least money, and continue the payments on stock subscription until the value of his stock reaches par. It will be noticed that all the stock receives the benefit of the premiums paid, that of the party receiving the so-called 'loan' equally with that of the other stockholders; and the larger the aggregate premium paid, the

sooner the value of the stock will reach par, and the sooner the stated payments on account of stock subscriptions will cease. Endlich on Building Associations, at page 161, says: 'If we consider the reasons which may be assumed to have guided legislatures in conferring upon building associations the extraordinary privileges and immunities which they enjoy, it will be readily understood (and there can be no other apology for it) that at the bottom of it all is a motive of public policy. The primary design of building associations is to encourage the acquisition of real estate, the building of dwellings, the ownership of homesteads, to increase the proportion of property holders among that class of the population whose slow and laborious earnings are, by reason of their pettiness, most fugitive, and generally spent before they reach a sum of sufficient magnitude to back a desire for those guaranties of good citizenship which the policy of our law has always found in landed property. That is the class for whose benefits building associations were originally devised, from among whose numbers their membership was, and for the most part still is, drawn; and all the incidents of membership were designed to accomodate their necessities, and intended to serve their purposes.' The legislature of Dakota territory (§ 3, c. 41, Laws 1889) used the following language: 'As building and loan corporations are aggregations of laborers, mechanics, workmen, and working women, which start without any paid up capital, and as these members pay only each month an assessment in proportion to shares, for the purpose of furnishing a home to each of its members in turn, which assessment stops the moment that every member has thus been furnished with such a home, these associations are hereby declared to be benevolent institutions within the meaning of § 2, c. 28, of the Political Code of 1877.' Rev. Laws. It is at once apparent that the transactions of these associations are separated by essential differences from the ordinary loaning business. * * * It seems very clear to us that the operations of building and loan associations, when confined to their own members, differ so radically from ordinary loan transactions that the legislature was clearly warranted in placing such transactions in a separate class for the purposes of

such legislation as pertains to interest and usury; and, the classification being once established, the extent to which the classes shall be separated is purely a matter of legislative discretion. The legislature has the right to leave such associations untrammeled in the matter of premiums paid for loans, and it has an equal right to leave them untrammeled in the matter of interest proper."

Is the classification of railroad companies for purposes of taxation a purely arbitrary one, or is it justifiable upon the ground that these corporations, by virtue of their peculiar powers and liabilities, differ from the other persons in the community, and constitute a peculiar class by themselves? A railroad is a public highway, operated for the public benefit; and, although it may be owned by a private corporation, yet it is charged with a public use, and the owner, in operating it, has a public duty to perform. Sharpless v. Mayor, etc., 21 Pa. St. 169. He must carry for all alike, and cannot discriminate in favor of any person or individual. When goods are offered him for carriage, he cannot refuse to receive them, or to transport them to the designated place; and after he receives them he is responsible for their safe carriage and delivery, and cannot excuse himself at common law except by showing that the act of God or of the public enemy prevented him from performing his duty. In the carriage of passengers he must exercise extraordinary care to insure his passenger's safety, and the burden is upon him to show that he exercised this degree of care. Such, briefly stated, are some few of the onerous duties and burdens cast by the law upon common carriers. In return for these, railroad companies are given the right to construct and operate their railroads, and are, for these purposes, vested with the power of eminent domain. But in all their operations they are public servants, subject to regulation by the public, and answerable to the public for any dereliction of duty. Indeed, they are public instrumentalities to such an extent that the public may not only be taxed to aid in the construction of their railroads, but, after such construction, may regulate the fares and tolls that are to be charged for the use of the railroads. A merchant may charge as much as he sees fit for his goods, a

farmer for his crops, a mechanic, artisan, or laborer for his work, a lawyer or doctor for his professional services. But railroad companies cannot do this. They may be regulated in the matter of their charges by the public, acting through its proper agents. All these facts, and others which it is not necessary to enumerate, place railroads in a different class by themselves, differing from every other person and individual, and make them legitimate objects of special legislation; as, for instance, the imposing upon them, as employers, of a different rule of liability to any employe for injury received by the negligence of a fellow servant from that governing employers generally (Railroad Co. v. Mackey, 127 U. S. 205, 8 Sup. Ct. Rep. 1161;) subjecting them to a special law to determine, for purposes of taxation, the value of their property (Kentucky Railroad Tax Cases, 115 U. S. 321, 6 Sup. Ct. Rep. 57;) the regulation of the charges which they may make for their services (Munn v. Illinois, 94 U. S. 113; 'the Granger Cases, Id 155; Stone v. Trust Co., 116 U. S. 307, 6 Sup. Ct. Rep. 334, 388, 1191;) requiring them to fence their railroad tracks, and, in case of failure so to do, to be liable to any person aggrieved in double damages (Railroad Co. v. Humes, 115 U. S. 513, 6 Sup. Ct. Rep. 110;) and compelling one railroad company operating a certain number of miles of railroad to charge one maximum rate for the carriage of passengers, and another company operating another number of miles of railroad to charge another maximum rate (Dow v. Beidelman, 125 U. S. 680, 8 Sup. Ct. Rep. 1028.) We are therefore clearly of opinion that railroad companies may be classified by themselves for the purposes of legislation, and it follows that, as taxation is a legitimate subject of legislation, they may be classified for purposes of taxation. We do not understand that respondent denies this proposition in so far as railroad property actually used in the operation of railroads is concerned. It is, however, earnestly argued that the appellant, in respect of its land grant, is in precisely the same position as any other owner of land, and that to exempt this land grant is, in effect, to cast additional burdens upon such other property owner, and to deny to him the equal protection of the law. The exemption of appellant's land grant

is not gratuitous, but is paid for upon a basis that seemed fair and just to the legislature.    Whether it was wise to enact the gross earnings law is not for this court to inquire.    If any land-owner contends that he is discriminated against, his contention should be addressed, not to the courts, but to the legislature. The appellant pays a certain tax upon its income, and in con- sideration therefor obtains an exemption from taxation for its lands.    No individual property owner in the state (then terri- tory) paid any tax whatsoever upon its income.    It would be as reasonable for the railroad companies to contend that the gross earnings law was void because the incomes of other persons were not taxed, as it is for respondent to contend that it is void because railroad lands are, by its terms, exempt.

But is appellant, as owner of its land grant, in exactly the same position as other owners of land?    We think not.    The individual who owns a city or town lot may erect a dwelling house thereon, and either live in it himself or rent it to another. He may erect a store thereon, or a manufactory, and carry on merchant's or manufacturer's business.    He may mortgage the property to secure his debts.    In fact, he may do what he sees fit with his land.    And the same is true of the owner of country land, who may cultivate it as a garden or farm, or mortgage it, or permit it to lie vacant and untilled.    And all individual prop- erty owners may at any time sell their lands, and dispose of the proceeds as they choose.    But appellant does not have like or equal or similar powers in respect to its land grant.    It possesses and holds its lands for certain specified purposes, and cannot exercise the same freedom of action in respect thereof as may be exercised by every other property owner.    The act of con- gress (chapter 217, 13 St. U. S. p. 365) whereby appellant was incorporated provided, by § 1, that appellant should have the power to "lay out, locate, construct, furnish, maintain, and en- joy a continuous railroad and telegraph line, with the appurte- nances," etc.    By § 2 a right of way was granted to appellant for its railroad and telegraph line over the public lands of the United States, to the extent of 200 feet in width on each side of said railroad, and this right of way was, by said § 2, declared to be exempt from taxation in the territories of the United

States. Section 3 was as follows: "That there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers," etc. Section 5 provided that the railroad and telegraph line should be constructed as therein specified. Section 10 enacts that "all people of the United States shall have the right to subscribe to the stock of the Northern Pacific Railroad Company until the whole capital named in this act of incorporation is taken up, by complying with the terms of subscription; and no mortgage or construction bonds shall ever be issued by said company on said road, or mortgage or lien made in any way, except by the consent of the congress of the United States." Section 11 declared that the railroad should be "a post route and a military road, subject to the use of the United States for postal, military, naval, and all other government service, and also subject to such regulations as congress may impose, restricting the charges for such government transportation." It is obvious from these provisions that congress considered the construction of appellant's railroad to be a matter of national importance warranting the grant of extraordinary aids and concessions by the federal government. In order to carry out the purposes of the act congress granted to the appellant a princely domain, a part of which composes the lands involved in this suit. But it is apparent from the provisions of appellant's charter above given that this land did not pass to appellant absolutely, and free from all restrictions and limitations as to its use. Appellant received the lands, and now holds them, subject to the purposes specified in its charter, and in strict subordination thereto. It holds them in trust, to carry out the object of its creation, as expressed in § 3 of the charter, namely, for the purpose of "aiding in the construction of said railroad, and to secure the safe and speedy transportation of the mails, troops, munitions of war and public stores;" and cannot make any disposition of the lands inconsistent with this pur-

pose.   It cannot mortgage the lands, or make or create any lien upon them except by and with the consent of congress.  It is true that it may sell them, but undoubtedly the proceeds of such sale must be applied to the purposes for which the lands were granted. It cannot cultivate the lands, because it is not authorized to engage in agricultural pursuits, but only to construct and operate a railroad and telegraph line.  It is expressly declared to be a post route and military road, subject to the use of the United States; and it cannot be questioned that, if the necessities of the case require it, the United States could use the railroad to the exclusion of every other person and fix the price to be paid appellant for such exclusive use.    Whether the railroad is used exclusively by the United States or jointly with others, the fact remains that the lands of appellant are held by it in order to aid in the operation of the railroad, and secure to its patrons adequate service, and reasonable charges therefor.    The entire people of the United States are interested in seeing that the appellant complies strictly with the provisions of its charter. The construction of the railroad was a national undertaking, subsidized by an immense grant of national property;  and the people of the United States have a direct interest in seeing to it that the appellant fulfills to the letter the obligations and duties it owes to the government.   By § 10 of appellant's charter it is expressly provided that " all people of the United States shall have the right to subscribe to the stock of the Northern Pacific Railroad Company."  Every citizen of the United States, whether rich or poor, had the right to invest his earnings in this great undertaking, and to reap the profits of such investment.    And as, by the whole tenor and spirit of the charter, the appellant's railroad was made a national institution, so it is that it is now, and always has been, a railroad corporation owing peculiar and extraordinary duties to, and under most supreme obligations to the people of the United States, both in respect of the operation of its railroad and the ultimate disposition of its land grant.    It is therefore without any doubt or hesitation that we say that the appellant, in respect of its land grant, does not occupy the same or a similar position as other land owners, and is a legitimate object upon which the territorial legislature

could exercise its power to classify in the matter of taxation. We may also mention here another reason that has influenced us in reaching this conclusion. The right of way of appellant's railroad was expressly exempted from taxation, within the territories of the United States, by § 2 of the charter. There can be no doubt but that if congress had seen fit, it could also have exempted appellant's land grant from taxation within said territories. But congress did not go to this extreme. It left the question to be settled by each territory of the United States through which appellant's road might run. Dakota territory saw fit, by its legislature, to pass the gross earnings law of 1883, thereby exempting appellant's land grant from taxation. The statute is, in its legal effect, in precisely the same position as a similar statute passed by congress would be. The jurisdiction of congress over the territories of the United States is supreme, and corresponds to the powers of a state over its municipal organizations. It has full and compete legislative authority over the people of the territories and all the departments of the territorial governments. It may legislate directly for the territories, and such legislation will be the supreme law of the land, and cannot be questioned or invalidated. Insurance Co. v. Bales of Cotton, 1 Pet. 511; Bank v. Yankton, 101 U. S. 129. But this power was delegated to the legislative department of the territory of Dakota at the time of its organization, and hence that body succeeded to and became possessed of all the powers of congress in respect of legislation in said territory. Nevertheless, congress could at any time withdraw this grant, or could legislate directly for the territory, and could annul any act passed by the territorial legislature. If congress did not choose to annul any act, then such act became valid and binding, and was, to all intents and purposes, the act of congress itself. Dubuque v. Iowa, 12 How. 1; Bank v. Yankton, 101 U. S. 129. By appellant's charter, the right of way of the railroad was exempted from taxation within the territories of the United States; and it cannot be doubted that congress could also have exempted the land grant within said territories, had it seen fit so to do. By the organic act, congress delegated this power to the territorial legislature. The latter body exercised the power

by passing the gross earnings law of 1883; and, as congress had never annulled or repealed the law, it had the same effect as a similar act of congress itself. It must be considered as, and is, an act of congress, and must be given the same force and effect as though duly enacted by that body. Railroad Co. v. Lesueur Co. (Ariz.), 19 Pac. Rep. 157.

The only other constitutional question raised at the argument is whether the law is void because, being concededly invalid in so far as it attempted to tax the earnings derived from interstate traffic, the remaining portions, being inseparably connected with the void parts, must fall with them. The argument of respondent is that the gross earnings law of 1883 is void so far as interstate earnings of railroad companies are concerned; that the legislature would not have passed the law if it had known that interstate earnings could not be taxed; that, by the terms of the act, earnings upon local traffic cannot be separated from interstate earnings for purposes of taxation; that all the earnings of railroads must be taxed or none at all; and hence that, as the tax on interstate earnings cannot be sustained, the entire act falls to the ground. The earnings of railroads, derived from interstate traffic or business, cannot be taxed by the states. Fargo v. Michigan, 121 U. S. 230, 7 Sup. Ct. Rep. 857; Steamship Co. v. Pennsylvania, 122 U. S. 326, 7 Sup. Ct. Rep. 1118. The act of 1883 was expressly declared by the supreme court of Dakota territory to be unconstitutional, in so far as it related to interstate commerce, in the case of Railroad Co. v. Raymond, 5 Dak. 356, 40 N. W. Rep. 538. That case, however, did not touch upon or decide the question now under consideration. It is our duty to construe the act so as to make it constitutional, unless it clearly appears that it cannot be sustained by any reasonable intendment or allowable presumption. People v. Supervisors, 17 N. Y. 241. It is to be presumed that the legislature did not intend to exceed its jurisdiction, and tax earnings of appellant derived from interstate commerce, and this presumption must prevail, unless it is clearly rebutted by the language of the act itself. If that language is susceptible of two constructions, one of which will invalidate the statute, and the other of which will sustain

it, the clear duty of the court is to adopt the latter construction. Endl. Interp. St. 247; Opinion of Justices, 41 N. H. 553. The language of the statute is that "there shall hereafter be paid into the treasury of this territory a percentage of all the gross earnings of the corporation owning or operating such railroad, arising from the operation of such railroad as shall be situated within this territory." This language does not, in terms, extend to earnings on interstate traffic, nor is it, in terms, limited to local earnings. The language is broad and general, and necessarily requires construction by the court to determine its precise meaning. The "gross earnings" which were taxed were derived "from the operation of such railroad as shall be situated within this territory." (If the argument of respondent be correct, then it forces us to the conclusion that it was intended to tax the gross earnings from interstate traffic whenever that traffic passed over a part of any railroad situated within the territory. Thus, if a shipment be carried by appellant from St. Paul to Tacoma, and it receives $100 as freight earnings therefor, the argument of respondent is that these earnings were intended to be taxed by the act.) We think a fair construction of the language does not warrant this conclusion. Nor is there anything in the act which warrants the conclusion that it was intended to tax a proportionate part of these earnings, derived by comparing the number of miles the shipment passed over appellant's railroad within the territory with the total number of miles it passed over appellant's railroad. In order to arrive at such a construction, it would be necessary to insert new and additional words in the statute; and this, of course, is not permissible. To do so, would be to make a new law, not to construe the old one.

What then is the true construction to be placed on the language? If the language is transposed, and placed in its proper order, it would read: "All the gross earnings arising from the operation of such railroad as shall be situated within this territory." It is obvious that the intent of the legislature could not have been to tax all the gross earnings of any corporation that might happen to operate a railroad situated within the territory. And yet a strict grammatical construction would war-

rant this conclusion because the modifying clause, "as shall be situated within this territory," apparently, at first blush, applies to the word "railroad," immediately preceding, and is descriptive of the kind of railroad which the coporation must operate in order to come within the provisions of the act. If, then, this clause modifies the preceding word "railroad," the remarkable conclusion would follow that the appellant, which operates a railroad "situated within this territory," would be compelled to pay a tax on "all the gross earnings" which it might earn over its entire system.    Such a construction of the statute would be absurd,    We think the only true construction is that the clause modifies the words, "all the gross earnings," and was intended to explain what those words meant.    Striking out the unnecessary words for the sake of grammatical correctness, and transposing the modifying clause, we find that the statute, thus construed reads: "All the gross earnings arising from the operation within this territory of such railroad."    The gross earnings derived from such operation are the gross earnings on local business, for to construe them otherwise would be to impute to the legislature an intent to do an unlawful act.    Any other construction would invalidate the statute, and we do not think there is any warrant for the court, by adopting an unnecessary conclusion, to annul a solemn act of a co-ordinate department of government, passed in due and proper form.    As under the gross earnings law all "property" situated in the territory owned by the Northern Pacific Railroad Company was exempt from taxation, these lands were exempt if they were "property" of the railroad company.    If they were not "property" of the railroad company, they were exempt as lands of the United States.    The complaint sets forth the proceedings by which the railroad company acquired title to these lands, if any it has, from the United States.    If those proceedings were insufficent to vest a title in the railroad company, the title remained in the government. All titles to land in Dakota came from the government of the United States, and in the absence of a showing that the United States has parted with the title, the legal presumption is that the title remains in the government.    Patterson v. Tatum, 3 Sawy. 170.    Consequently, the lands described in the bill were

exempt from taxation at the time of the assessment and levy, and such assessment and levy were void.

The only remaining question is, therefore, does the complaint show such a title in the railroad company as will enable it to maintain this action? Of course, if plaintiff has no interest in these lands, their taxation and sale cannot work any injury to it, and it cannot be heard to complain. The third section of the act of July 2, 1864, granting lands to the Northern Pacfic Railroad Company, is as follows: "That there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the route of said line of railroad, every alternate section of public land, not mineral, designated by odd numbers, to the extent of twenty alternate sections per mile on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof the United States has full title, not reserved, sold, granted, or otherwise appropriated, and free from preemption or other claims or rights at the time the line of the road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, and not more than ten miles beyond the limits of said alternate section; provided, that if said route shall be found upon the line of any other railroad route, to aid in the construction of which lands have heretofore been granted by the United States, as far as the routes are upon the same general line, the amount of land heretofore granted shall be deducted from the amount granted by this act; provided, further, that the railroad company receiving the previous grant

of lands may assign their interest to said 'Northern Pacific Railroad Company,' or may consolidate, confederate, and associate with said company upon the terms named in the first section of this act; provided, further, that all mineral lands be, and the same are hereby excluded from the operation of this act, and in lieu thereof a like quantity of unoccupied and unappropriated agricultural lands in odd numbered sections, nearest to the line of said road, may be selected as above provided; and provided, further, that the word 'mineral,' when it occurs in this act, shall not be held to include iron or coal; and provided, further, that no money shall be drawn from the treasury of the United States to aid in the construction of said 'Northern Pacific Railroad Company.' " That this act makes a grant *in præsenti* is determined. Says the supreme court: "As seen by the terms of the act, the grant is *in præsenti;* that is, it purports to pass a present title to the lands designated by alternate sections, subject to such exceptions and reservations as may arise from sale, grant, pre-emption, or other disposition previous to the time the definite route of the road is fixed. The language of the statute is 'that there be, and hereby is, granted' to the company every alternate section of land designated, which implies that the property itself is passed, not any special or limited interest in it. The words also import a transfer of a present title, not a promise to transfer one in the future. The route not being at the time determined, the grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identification, and, when once identified, the title attached to them as of the date of the grant, except as to such sections as were specifically reserved. It is in this sense that the grant is termed one *in præsenti;* that is to say, it is of that character as to all lands within the terms of the grant, and not reserved from it at the time of the definite location of the route." St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 5, 11 Sup. Ct. Rep. 389. As the grant is of "every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line," the specific sections granted remain afloat, and are incapable of identification until

the line of road is definitely located. But when that line is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office, the base line on each side of which the alternate odd-numbered sections are to be taken is determined. Railway Co. v. Dunmeyer, 113 U. S. 640, 5 Sup. Ct. Rep. 566. This act does not, in terms, prescribe a lateral limit within which the land granted is to be taken. It is of lands "to the amount of twenty alternate sections per mile." In this respect it differs from every preceding grant of lands made by congress to aid in the construction of railroads; but, while no lateral limits are made in terms, it by no means follows that the filing of the map of definite location does not identify any of the lands granted. The grant being of "every alternate section" that was free from adverse claims, no license was given the grantee to roam over the public lands, taking odd sections at will. The grant was to be satisfied from the undisposed of, non-mineral, odd-numbered sections nearest to the line of the road. The company was not at liberty to pass beyond lands open to appropriation under the grant, and take lands further removed from the line of its road. This being so, and as all odd-numbered sections within forty miles on each side of plaintiff's road would be required to satisfy its grant, even were there no losses by reason of reservation, sales, grants, or the attachment of pre-emption, or other claims or rights, prior to the filing of the plat of definite location of the road in the general land office, the filing of the plat necessarily identified all of the odd-numbered sections of non-mineral, public land within forty miles of the line as a portion of the grant, and causes the title granted to attach thereto without further selection on the part of the grantee. Wood v. Railroad Co., 104 U. S. 327; Vance v. Railroad Co., 12 Neb. 285, 11 N. W. Rep. 334; St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 11, 11 Sup. Ct. Rep. 389.

These considerations justify the conclusion that the act of July 2, 1864, in effect, although not in terms, fixes a lateral limit of forty miles on each side of the line of the road within which every alternate section of non-mineral land, designated by odd numbers, and which was not reserved, sold, granted, or otherwise disposed of, and is free from pre-emption or other

claim or rights at the time the plat of the definite location of the road is filed with the commissioner of the general land office, is identified by fixing the line as granted. The language of the indemnity provision confirms this construction. "And whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, etc., other lands shall be selected, not more than ten miles beyond the limits of said alternate sections"—is intelligible only upon the theory that a lateral limit is to be understood. "Any of said sections or parts of sections" necessarily refers to the sections within the limits of twenty alternate sections, or forty miles on each side of the road; and the provision that the indemnity shall be selected "not more than ten miles beyond the limits of said alternate sections" plainly means that such selections must be made not more than ten miles beyond the forty-mile limit, or not more than forty, and within fifty miles of the road. It is within this indemnity belt that the lands described in the complaint are located. When and in what manner is the title to land within the indemnity belt acquired? The granting terms of the act are such as, standing alone, would make a grant of quantity. U. S. v. Railroad Co., 98 U. S. 334. They are of " lands to the amount of twenty alternate sections per mile." In this respect this grant differs radically from most railroad land grants, which are of " every alternate section per mile designated by odd numbers for six [or ten] sections in width, on each side of said road." But the granting terms are somewhat restrained and modified by the indemnity provisions. By these provisions, as contained in the original act, the limit in which the quantity granted must be satisfied, if at all, is restricted to the belt inclosed within the fifteen-mile limits on each side of the line. And the terms of the act giving the right to select indemnity for such lands as had been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, by implication forbids the taking of indemnity for a deficiency in quantity arising from other causes, if any there are. *Expressio unius est exclusio alterious.* The indemnity provision is broad enough to include all possible modes of disposition of land. But it is not intended to supply a deficiency in the quantity granted of forty sections

per mile arising from the non-existence of such quantity of land within forty miles of the line on each side, and where the grant overlaps large meandering bodies of water.    Subject to these modifications, the grant is one in quantity; that is, it grants to the Northern Pacific Railroad Company an amount of land equal to the amount of land included within odd-numbered sections within the limits of a belt forty miles in width on each side of the line of the road, provided that amount can be found within the limits of a belt fifty miles in width on each side of said line; the lands within the forty-mile limit to be first exhausted. The quantity granted is further subject to a reduction by the existence of the state of facts contemplated in the first proviso: "That if said route shall be found upon the line of any other railroad route, to aid in the construction of which lands have heretofore been granted by the United States, as far as the routes are upon the same general line the amount of lands heretofore granted shall be deducted from the amount granted by this act." To this extent the amount of lands granted to the plaintiff is reduced.

By the joint resolution approved May 31, 1870 (16 St. p. 378), congress, anticipating that plaintiff would find difficulty in securing the amount of land granted within the limits designated in the act of July 2, 1864, provided that, "in the event of there not being in any state or territory in which said main line or branch may be located, at the time of the final location thereof, the amounts of land per mile granted by congress to said company, within the limits prescribed by its charter, then said company shall be entitled, under the directions of the secretary of the interior, to receive so many sections of land belonging to the United States, and designated by odd numbers, in said territory or state, within ten miles on each side of said road, beyond the limits prescribed in said charter, as will make up such deficiency on said line or branch, except mineral and other lands, as excepted in the charter of said company of 1864, to the amount of the lands that have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of subsequent to the passage of the act of July 2, 1864." The phrase in this resolution, "the amount of lands per mile granted

by congress to said company within the limits prescribed by its
charter," includes lands within place and indemnity limits.
Railroad Co. v. U. S., 36 Fed. Rep. 282. This language is incon-
sistent with any idea save that of a grant of quantity. Were
the grant of specific sections with a mere right to select indem-
nity for such portions thereof as had been previously appro-
priated, there could not be a deficiency at the time of the final
location of the road of the "amount of the lands granted per
mile." The "amount of the lands granted" would be simply
the amount of lands remaining undisposed of within the place
limits at the date of fixing the definite location of the road,
since the grant is in terms of such unappropriated lands only.
The "amount of lands per mile" is obviously the amount of
twenty sections per mile on each side of the line, subject to de-
ficiencies arising from their non-existence, or having been pre-
viously granted to aid in the construction of another railroad,
having its line on the same general route. The description of
this amount as "granted by congress" is plainly expressive of
the intent of that body. This resolution and the original act are
*in pari materia,* and, though enacted at different times, are to
be treated prospectively, and construed together, as though they
constituted a single act. Suth. St. Const. § 283; Converse v. U.
S., 21 How. 463; Railroad Co. v. Barden, 46 Fed. Rep. 602. It
is a matter of public notoriety and general history that at the
time this resolution was passed the railroad company had not
fixed the general or definite route of any portion of its line. It
had done nothing. It appears in many of the public documents
printed for public distribution by the government that no por-
tion of the general route even was fixed prior to August, 1870.
Referring to the amendment to this act made by the act ap-
proved July 15, 1870, the supreme court says, in the case of
Railroad Co. v. Traill Co., 115 U. S. 600, 6 Sup. Ct. Rep. 201,
that the power to amend in that instance was exercised "before
the company had built a mile of road, or earned an acre of land,
or in any other manner secured an equitable right to the lands."
And, although this fact does not appear in the pleadings, we
think the court can fairly take judicial notice thereof. Bybee
v. Railroad Co., 26 Fed. Rep. 588, 139 U. S. 674, 11 Sup. Ct.

Rep. 641. Under these circumstances the interpretation placed by congress on this resolution in the original act should be adopted and followed by the courts. "If a thing contained in a subsequent statute be within the reason of a former statute, it shall be taken to be within the meaning of that statute; and if it can be gathered from a subsequent statute *in pari materia* what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute." U. S. v. Freeman, 3 How. 564. "Where it can be gathered from a later act that the legislature attached a certain meaning to an earlier cognate one, this would be taken as a legislative declaration of its meaning there." Endl. Interp. St. § 366. And see Suth. St. Const. § 402; Philadelphia, etc., R. Co. v. Catawissa R. Co., 53 Pa. St. 61; U. S. v. Gilmore, 8 Wall. 330; U. S. v. Alexander, 12 Wall. 180. The indemnity lands are therefore granted equally with the place lands, or lands within the forty-mile limits, by this act. They are of the "amount of twenty sections per mile" granted, and the words, "thereby and hereby is granted," apply to them, and pass the title. The only distinction between the two classes of land is the method by which they are identified. Once identified, the company has the same title to the one as to the other. The indemnity provision does not make an additional grant, but simply points out the method by which lands already granted may be identified. Grants of this nature are not new. By the seventh section of the Nevada enabling act, approved March 21, 1864 (13 St. p. 32), congress provided "that section sixteen and thirty-six in every township, and, where such sections have been sold or otherwise disposed of by any act of congress, other lands, equivalent thereto, in legal subdivisions of not less than one-quarter section, and as contiguous as may be, shall be, and hereby are, granted to said state for support of common schools." The supreme court held that "this was to grant to the state *in præsenti* a quantity of land equal in amount to the sixteenth and thirty-sixth sections, the grant to take effect when the *status* of the lands was fixed by survey and they were capable of identification. Congress, however, reserved, until this was done, the power of disposition,

and if, in the exercise of this power, the whole or any part of a sixteenth or thirty-sixth section had been disposed of, the state was to be compensated by other lands equal in quantity, and as near as may be in quality.   *   *   *   Congress said to the people of the territory: 'You shall, if you decide to come into the Union, have for the use of schools a quantity of land equal to two sections in each township, and the identical sections themselves, if on survey no one else has any claim to them.'" Heydenfeldt v. Mining Co., 93 U. S. 634.   In Hedrick v. Hughes, 15 Wall. 123, a similar grant received a similar construction.   In Minneapolis & St. C. R. Co. v. Duluth & W. R. Co., 47 N. W. Rep. 464, the supreme court of Minnesota held a grant of "an amount of swamp lands equal to ten sections per mile for each mile of said road that may be completed, to be selected within ten miles on each side of said road, and, in case there is not sufficient amount of said swamp lands unsold or unappropriated within each ten-mile section of said road as completed, then said company shall have the privilege of locating the deficiency on any of the swamp lands belonging to or to accrue to the state, not otherwise previously disposed of, within the counties of St. Louis, Lake, and Cook, and no other counties in the state," to be a grant of quantity if that quantity could be obtained within these limits, and to vest title to the lands to be selected outside the ten-mile limits, upon their identification, equally with those within those limits.   In Railway Co. v. Brown, 24 Minn. 517, a similar construction was placed upon another grant analogous to that of plaintiff in its provisions.

As we have seen, when the line of the road is definitely located, and a plat thereof filed in the office of the commissioner of the general land office, the grant, previously a float, acquired precision.   The sections within the forty-mile or place limits become susceptible of identification.   The idemnity limits themselves are defined.   The number of acres required to satisfy the grant, and which are to be taken within the indemnity limits, is fixed; and the grant, previously a float, both as to exact quantity and location, becomes a specific quantity to be taken within a defined limit.   As said by the supreme court: "When the line was fixed, which we have already said was by the filing of

the plat of definite location in the office of the commissioner of the general land office, then the criterion was established by which the lands to which the road had a right were to be determined. Topographically, this determined which were the ten odd sections on each side of that road where the surveys had been made. This filing of the map of definite location furnished also the means of determining what lands had been previously to that moment sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim had attached; for by examining a plat of this land in the office of the register and receiver, or in the general land office, it could have readily been seen if any of the odd sections within the ten miles of the line had been sold or disposed of, or reserved, or a homestead or pre-emption claim had attached to any of them. In regard to all such sections, they were not granted. The express and unequivocal language of the statute is that the odd sections, not in this condition, are granted." Railroad Co. v. Dunmeyer, 113 U. S. 640, 5 Sup. Ct. Rep. 566. The company, after filing the plat of definite location, has the title to a fixed amount of land, to be selected by it, under the directions of the secretary of the interior, from among the odd numbered sections of un-appropriated land within the indemnity limits. To the extent of this quantity the government title to the odd-numbered sections is divested; and, assuming that the government had the right to locate this quantity, and designate the particular parcels to be taken in satisfaction thereof, and the right to say where it should not be taken, with the consequent right to dispose of the surplus before satisfying the grant (an assumption by no means warranted by the language of the act), yet it would be obliged to retain a sufficient quantity of lands to satisfy this grant. U. S. v. McLaughlin, 127 U. S. 428, 8 Sup. Ct. Rep. 1177; Minneapolis & S. C. R. Co. v. Duluth & W. R. Co., 45 Minn. 104, 47 N. W. Rep. 466. The sole purpose of the selection under a grant of quantity is to identify the specific parcels granted, and so attach thereto the vested title. It does not operate to create a new title or interest. It but defines the particular object upon which the previous general gift shall operate; and, if that particular object is ascertained,

or pointed out in any other manner, a selection is unnecessary. Thus, if at the time of the definite location of the line of the road it should appear that there were not more unappropriated lands within the indemnity limits than were sufficient to satisfy the quantity to be taken therefrom, or if at first there were more than sufficient, and the quantity should be subsequently reduced from any cause until the quantity granted equaled the number of acres applicable to the satisfaction thereof, the grant would at once attach to those remaining lands, vesting in the grantee the title thereto without either selection or approval thereof. U. S. v. McLaughlin, 127 U. S. 428, 8 Sup. Ct. Rep. 1177; Minneapolis & S. C. R. Co. v. Duluth & W. R. Co., 45 Minn. 104, 47 N. W. Rep. 466; St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 11 Sup. Ct. Rep. 389. When all of the odd-numbered sections are necessary to give the quantity granted, there can, of course, be no selection. There is no choice to be taken from among a number. The indemnity lands would be as fully identified as the place lands. "The title to the alternate sections to be taken within the limit, when all the odd sections are granted, becomes fixed, ascertained, and perfected in each case by this location of the line of railroad." St. Paul & S. C. R. Co. v. Winona & St. P. R. Co., 112 U. S. 726, 5 Sup. Ct. Rep. 334; Wood v. Railroad Co., 104 U. S. 329.

In St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 11 Sup. Ct. Rep. 389—an action brought to determine the title to lands within the conflicting limits, both place and indemnity, of congressional grants made to aid in the construction of two roads—it was strenuously urged that there had been no selection shown on the part of the Northern Pacific Company to certain indemnity lands. It was established that there were not, at the time of the definite location of the Northern Pacific Railroad, sufficient lands within the indemnity limits, subject to appropriation for the purpose, to make up for the deficiency within the place limits. Says the court: "As to the objection that no evidence was produced of any selection by the secretary of the interior from the indemnity lands to make up for the deficiency found in the lands within the place limits, it is sufficient to observe that all the lands within the indemnity limits only made up in part for

those deficiencies.    There was, therefore, no occasion for the
exercise of the judgment of the secretary of the interior in select-
ing from them, for they were all appropriated." This language
is consistent only with the assumption of an existing grant of
quantity to be satisfied from the indemnity limits.  It is totally
inapplicable to a grant of a mere right to initiate a new right
or interest in lands by a selection.  Of such a right the supreme
court has said: "Was there a vested right in the company dur-
ing all this time to have not only these lands, but all the other
odd sections within the twenty-mile limits on each side of the
line of this road, awaits its pleasure?    Had the settlers in that
populous region no right to buy of the government because the
company might choose to take them, or might, after all this
delay, find out that they were necessary to make up deficiencies
in other quarters?    How long were such lands to be withheld
from market, and withdrawn from taxation, and forbidden to
cultivation?    It is true that in some cases the statute requires
the land department to withdraw the land within these second
limits from market, and in others the officers do so voluntarily.
This, however, is to give the company reasonable time to ascer-
tain its deficiencies and make its selections.    It by no means
implies a vested right in said company, inconsistent with the
right of the government to sell, or of any other company to
select, which has the same right of selection within those limits.
Each company, having the right of such selection in such case,
and having no other right, is bound to exercise that right with
reasonable diligence, and, when exercised in accordance with
the statute it becomes entitled to the lands so selected."    St.
Paul & S. C. R. Co. v. Winona & St. P. R. Co., 112 U. S. 732, 5
Sup. Ct. Rep. 334.    Again: "A right to select, then, within cer-
tain limits, in case of a deficiency within the ten-mile limit, was
alone conferred; not a right to any specific land or lands capa-
ble of any identification by any principle of law or rules of
measurement.    Neither locality nor quantity is given, from
which such lands should be ascertained.    If, therefore, when
such selection was to be made, the land from which the deficiency
was to be supplied, had been appropriated by congress for other
purposes, the right of selection became a barren right, for until

selection was made the title remained in the government, subject to its disposal at its pleasure." Kansas Pac. R. Co. v. Atchison, T. & S. F. R. Co., 112 U. S. 414, 5 Sup. Ct. Rep. 208. In Railroad Co. v. Price Co., 133 U. S. 496, 10 Sup. Ct. Rep. 341, the court, construing a grant of specific lands, with a right to select indemnity, says of the indemnity lands: "For such lands no title could pass to the company, not only until such selections were made by the agents of the state, appointed by the governor, but until such selections were approved by the secretary of the interior. * * * The government was, indeed, under a promise to give the company indemnity lands in lieu of what might be lost by the causes mentioned. But such promise passed no title, and, until it was executed, created no legal interest which could be enforced by the courts." And to the same effect in the construction of similar grants, see Chicago, M. & St. P. Ry. Co. v. Sioux City & St. P. R. Co. 117 U. S. 406, 6 Sup. Ct. Rep. 790; Barney v. Railroad Co., 117 U. S. 228, 6 Sup. Ct. Rep. 654. The impossibility of reconciling these decisions with the decision in St. Paul & P. R. Co. v. Northern Pac. R. Co., *supra,* except under the theory that the Northern Pacific act vested in the grantee more than a mere right to initiate a title by selection in the indemnity limits, is apparent; and we think the supreme court in that case settled that this act made a grant of quantity. Wherever the area of lands within the indemnity limits subject to the grant exceeds the area of lands granted, the grant remains, within those limits, a float. A selection is necessary to identify the particular lands, and attach thereto the title granted. When the selection and location is made pursuant to the act, of lands subject to selection, the general gift of quantity becomes a gift of the specific lands selected, vesting in the railroad company a perfect and absolute title to the same. Patterson v. Tatum, 3 Sawy. 166; Doll v. Meador, 16 Cal. 320; Minneapolis & St. C. R. Co. v. Duluth & W. R. Co., 45 Minn. 104, 47 N. W. Rep. 464; Railroad Co. v. Wiggs, 43 Fed. Rep. 333; Wardwell v. Paige, 9 Or. 521.

The facts alleged in the complaint sufficiently show—*First,* a deficiency in the amount of lands within what we may call the "place limits" of the grant to which plaintiff was entitled; *sec-*

*ond,* the existence of the lands at the time of selection, properly subject thereto; *third,* a selection of the lands here involved by the company "under and in accordance with the directions of the secretary of the interior." This phrase appears to us to indicate that the selections were made in the manner required by the regulations promulgated by the secretary in conformity with pre-existing rules. We do not think it imports, as used, an approval of the selection by the secretary. This allegation, objectionable, perhaps, as a conclusion of law, is defined by a statement of the manner of making the selections, thus: "Plaintiff made the selection aforesaid by filing with the register and receiver of the local land office of the district on which said lands were located lists designating the parcels of land so selected, and the tracts within forty miles of the railroad in the territories, and twenty miles therefrom in the states, lost to the company as aforesaid, and in lieu of which the same were selected; and paid to the register and receiver the selection fees required by law. Said lists were allowed and approved by said register and receiver, and said fees were accepted by them, under and in accordance with a circular of instructions to them from the commissioner of the general land office, by direction of the secretary of the interior, by reason of which facts plaintiff claims to have acquired an interest in all of said lands so selected. Said secretary of the interior has, since the selections aforesaid were made, modified and changed the conditions to be performed by the company in completing said selections, and claims the right to require said lists to be modified by said company before he shall finally approve, allow, and adjust said selections; and claims that the railroad company has acquired no legal or equitable title therein." It is said these allegations are insufficient to show a title in plaintiff, in that it is not alleged that the secretary of the interior has approved these selections. We do not think such allegation is necessary. We think the complaint shows a good title in plaintiff to these indemnity lands. We are unable to see in what way this title is dependent upon the secretary's approval of the lists. Certainly the act does not in terms require such approval, nor do we think there is anything in the act from which such a condition precedent to

the vesting of the title in the grantee could be fairly implied. The act in terms provides that for the specified deficiencies "other lands shall be selected, by said company in lieu thereof, under the directions of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond" the forty-mile limit. It has been urged that the phrase, "under the direction of the secretary of the interior," is equivalent to, and is intended to convey the same meaning as "subject to the approval of the secretary of the interior." Such is not the plain and ordinary meaning of the terms used. "Direction," says Mr. Webster, is an "order prescribed, either verbally or written; instructions in what manner to proceed. The employer gives directions to his workmen; the physician to his patient." LORD COLERIDGE, defining the phrase "under the direction of," says: "Work is done by the direction of the board, who were represented by the surveyor. It is to be done in the manner in which they should prescribe, and is therefore done under their direction." Newton v. Ellis, 5 El. & Bl. 124. To make the selections "under the direction of the secretary of the interior" is to make them in accordance with the rules and regulations prescribed by him. The object of this provision is undoubtedly that the interior department and the public may be advised as to what lands are appropriated under the grant, and thereby withdrawn from settlement and entry as a part of the public domain, and that the government may be advised when the quantity grant is satisfied. To secure these purposes and uniformity in the manner of selection, the secretary was authorized to prescribe the procedure to which the company must conform in making the selections. But it is in terms prescribed that the "lands shall be selected by said company." To "select," says Mr. Webster, is "to choose and take from a number; to take by preference from among others; to pick out; to cull." This power of choice is to be from among all the unappropriated odd-numbered sections of land "not more than ten miles beyond" the forty-mile limits. It is to be exercised by "said company." This phrase renders clear the interpretation to be given to the words "under the direction of the secretary of the interior." The clause must be so construed that both these

phrases may stand together, and both be given their full force
and meaning. A construction of the phrase "under the direc-
tion of the secretary of the interior," which would vest him with
power to dispose of the indemnity lands after the right of selec-
tion had attached, or vest him with authority arbitrarily to re-
fuse to recognize a selection made by the company in proper
manner, upon a proper basis, of lands subject to the right of
selection, or by neglect or refusal to approve the selections
prevent the title to the indemnity lands from vesting in the
grantee, would deprive the company of the right of selection.
It would make the words "by said company" surplusage, and
deprive them of any effect whatsoever. It is a principle of law
that, in the absence of language expressly vesting in the grantee
the right to locate a float, the right of location remains in the
state. U. S. v. McLaughlin, 127 U. S. 428, 8 Sup. Ct. Rep. 1177.
In the Northern Pacific act this right of selection is, in so many
words, given to the grantee; and, the intention of congress to
alter the ordinary rule being so expressly stated, the statute
must receive such a construction as will give that intention
effect. This construction is in accordance with the spirit of
this act. As we have seen, the intention of congress was to give
to the company a certain quantity of lands. Extraordinary care
was taken to secure the successful execution of this intention.
By the sixth section of the act provision was made for the res-
ervation of the lands from sale, pre-emption, or entry, before or
after they were surveyed, immediately upon the fixing of the
general route of the road, and long prior to the time when the
lands would be defined by filing the plat of definite location.
"The object of the law in this particular is plain. It is to pre-
serve the land for the company, to which, in aid of the con-
struction of the road, it is granted." Buttz v. Railroad Co., 119
U. S. 72, 7 Sup. Ct. Rep. 100; St. Paul & P. R. Co. v. Northern
Pac. R. Co., 139 U. S. 1, 11 Sup. Ct. Rep. 389. Six years later
a second indemnity belt was provided, to be resorted to in cer-
tain contingencies, to secure to the company "the amount of
lands per mile granted." And it is inconceivable that congress,
having taken such extraordinary precaution to secure to the
company this quantity of land, yet intended to leave it within

the power of a subordinate official of a co-ordinate branch of the government to defeat this purpose by arbitrarily refusing to sanction with his approval the selections made by the company, or disposing of the lands for other purposes.

The position that approval by the secretary is necessary to the vesting of the title in the grantee undoubtedly has its suggestion in the fact that all preceding railroad grants prescribe such a condition precedent. The indemnity provisions in the grants of Sept. 20, 1850 (9 St. p. 466;) June 10, 1852 (10 St. p. 9;) February 9, 1853 (10 St. p. 156;) June 29, 1854 (10 St. p. 302;) May 15, 1856 (11 St. p. 9;) May 17, 1856 (11 St. p. 15;) June 3, 1856 (11 St. pp. 17–19, 21;) August 11, 1856 (11 St. p. 31;) March 3, 1857 (11 St. p. 195;) May 5, 1864 (13 St. p. 66;) March 3, 1865 (13 St. p. 520;) July 4, 1866 (14 St. p. 83)—are substantially as follows: "But in case it shall appear that the United States have, when the line of said road shall be definitely fixed by the authority aforesaid, sold any section, or any part thereof, granted as aforesaid, or that the right of pre-emption has not attached to the same, then it shall be lawful for any agent or agents, to be appointed by the governor of said state, to select, subject to the approval of the secretary of the interior, from the lands of the United States nearest [or most contiguous] to the tier of sections above specified, so much land in alternate sections or parts of sections as shall be equal to such lands as the United States have sold," etc. In the acts of March 3, 1863 (12 St. p. 772;) May 12, 1864 (13 St. p. 73;) July 1, 1864 (13 St. p. 339;) July 4, 1866 (14 St. p. 87;) July 23, 1866 (14 St. pp. 210, 236;) July 26, 1866 (14 St. p. 87)—the language is: "It shall be the duty of the secretary of the interior to cause to be selected," etc. In the act of March 3, 1865 (13 St. p. 526), it is: "And said lands granted shall be in all cases indicated by the secretary of the interior." In the act of May 5, 1864 (13 St. p. 64) it is: "Then it shall be the duty of the secretary of the interior to select from the lands of the United States," etc. The uniform use of language in these cognate acts plainly requiring the approval of the secretary of the interior before the selections become effective so as to pass the title to the lands, coupled with the failure to use similar appropriate language in the

Northern Pacific act, is very significant, and points to an intention on the part of congress to omit that requirement. "As the same expression is presumed to be used in the same sense throughout an act, or a series of cognate acts, so a difference of language may be *prima facie* regarded as indicative of a different meaning. Indeed, the words of a statute, when unambiguous, are the true guide to the legislative will. That they differ from the words of a prior statute on the same subject is an intimation that they are to have a different, and not the same, constuction." End. Interp. St. § 382. This principle has often · been evoked by the courts with decisive effect in statutory construction, and is strictly applicable to such a case as the one before us.

By the act of July 2, 1864, the following things are prescribed as requisite to a selection: *First*, that lands within the forty (or twenty in the states) mile limits of the grant should have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of prior to the time the line of the road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office; *second*, that the selection must be within ten miles of the place limits of the grant; *third*, they must be of odd sections, or parts of odd sections; *fourth*, they must be non-mineral public lands, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights; *fifth*, they must be made by the company; and, *sixth*, they must be made under the directions of the secretary of the interior. When these conditions are complied with, the land is at once identified, and passes under the grant. This act does not require, and the court cannot import, among the conditions precedent to the acquisition of title to indemnity lands by selection, the further conditions, "subject to the approval of the secretary of the interior." U. S. v. Railroad Co., 98 U. S. 339. The approval of these lists by the secretary would be of great importance to the company. The approved lists, like the patents, would be conclusive evidence that the government, by its authorized agent, had determined that there was a deficiency within the place limits, which the company was entitled to have filled from the indemnity

limits; that the company had selected these lands in the manner prescribed by the secretary, within the indemnity limits; and that they were a portion of the lands subject to selection. So far as the secretary was authorized by law to make this deter-mination, and in the absence of fraud, this determination or certificate by the government that it had satisfied itself upon these points would be conclusive as to these facts upon the gov-ernment and its privies; but it would not and could not add anything to the title granted to the company by the act itself. The rights of the company depend for their existence upon the act of congress, and the company's compliance with the conditions prescribed. They do not in the slightest degree depend upon the interior department satisfying itself of the existence of the facts showing such compliance, and issuing his certificate therefor, but upon the existence of the facts themselves. As soon as the facts exist, the rights exist. Wright v. Roseberry, 121 U. S. 488, 7 Sup. Ct. Rep. 985; Denny v. Dodson, 32 Fed. Rep. 903; St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 6, 11 Sup. Ct. Rep. 389; Doll v. Meador, 16 Cal. 295; Megerle v. Ashe, 33 Cal. 83; Hendrick v. Hughes, 15 Wall. 123; Railroad Co. v. Wiggs, 43 Fed. Rep. 338. In the last case the court had before it the very question presented here, arising as it did, upon one of the few railroad land grants similar in its terms to the Northern Pa-cific grant. In that case the company selected, as far as it could, without the concurrence of the department, the land in contro-versy, by presenting a list including the same, prepared in the usual form in use for such selections, to the district land officers, and tendering the necessary fees. The list was pre-sented July 9, 1885, but was rejected because the land had been patented June 12, 1885, to a settler. No question as to there being a deficiency, or that the selection was in proper form, was made. The company filed its bill to have the patent declared null and void as a cloud on its title. The court sustained the action. Judge SAWYER, delivering the opinion, after holding that there was a legislative reservation of the indemnity lands, by reason whereof the patent was void, says: "Although the selec-tion of the lieu lands was to be made under the direction of the secretary of the interior, they were to be 'selected by said com-

pany,' not by him; nor was the selection required to be approved by him, as is required by some other acts; and when there was a deficiency, and the company selected lands open to selection, there was no authority vested in the secretary to arbitrarily refuse to recognize and allow such selection. This would deprive the company of the right of selection expressly given by the statute, and vest it in the secretary, where, as the statute says in express terms, 'other lands shall be selected by said company in lieu thereof.' " The power and duty of the department to examine and pass upon these selections is unquestionable. The duty of issuing patents for indemnity lands properly selected carries with it the additional duty, and consequent power, of determining if they are properly selected; that is, of ascertaining whether there is a proper basis for the selection in the shape of a loss from the place limits; that the selection is of land subject to the right of selection, and is properly made, in compliance with the rules and regulations in force at its date. Where the selections are improperly made, or where the lands are not subject to the right of selection, or where there was no proper foundation therefor, they could properly be rejected and canceled by the department. Such power is necessary to the due administration of the land department. Indeed, if the lands were not subject to the right of selection, or there were no losses, the approval of the selection by the secretary would be ineffectual to pass any title to the company. There is nothing inconsistent in the existence of such authority in the department with the acquisition by the company if an indefeasable title to the lands prior to the approval of such selections, by a selection duly made of lands subject to the right of selection and in lieu of a proper loss. Thus it is the secretary's duty to examine the place lands before patenting the same, to ascertain if they are granted; but such duty on his part does not prevent the title to those of the place lands that fall within the conditions prescribed in the granting act vesting in the grantee immediately upon the fixing of the line of definite location, and long before such duty is performed. Nor will an erroneous decision on his part divest the rights vested by the operations of the act, but the courts will, when the matter is properly brought

to their attention, disregard such erroneous decision, and declare a patent wrongfully issued in accordance therewith void, or, if necessary, at the suit of such grantee, oust from the possession of the land the holders of such patent. Wright v. Roseberry, 121 U. S. 488, 7 Sup. Ct. Rep. 985; Mining Co. v. Campbell, 135 U. S. 286, 10 Sup. Ct. Rep. 765; Morton v. Nebraska, 21 Wall. 660; Francoeur v. Newhouse, 40 Fed. Rep. 620; Railroad Co. v. Cannon, 46 Fed. Rep. 224; Railroad Co. v. Amacker, Id 233; Railroad Co. v. Barden, Id 600. Under the pre-emption law, although the commissioner of the general land office or the secretary of the interior possesses such power of supervision over the district land officers as authorizes the correcting or annulling of entries allowed by them where the lands were not subject to entry, or the parties did not possess the qualifications required, yet, is it held that their power is not unlimited or arbitary? It can only be exercised when the entry was made on false testimony, or without authority of law. It does not prevent a qualified entryman, by a duly made entry of land, open to entry, securing, prior to the approval of such entry by the commissioner or secretary, a vested right therein, and a right to a patent therefor, of which he can no more be deprived by an order of the commissioner or secretary than he can be deprived by such order of any other lawfully acquired property. Cornelius v. Kessell, 128 U. S. 461, 9 Sup. Ct. Rep. 122; Smith v. Ewing, 23 Fed. Rep. 741; Stimson v. Clarke, 45 Fed. Rep. 762. And so, under the homestead law, by an entry properly made, with the district officers, the entryman acquired an interest in the land, indefeasible except by his own default. 17 Op. Attys. Gen. 160; Wilson ,v. Fine, 40 Fed. Rep. 52. And since it sufficiently appears from the allegations of the bill that the company was entitled to select this area of lands to make up the quantity granted, that the lands selected were of the lands subject to the right of selection, and that the selections were made by the company in the manner prescribed by the secretary, we are of the opinion that it shows the legal title to these specific lands has vested in the plaintiff, notwithstanding the failure of the secretary to approve the selections. The alleged refusal by the secretary to approve these selections

until the selection lists are altered to comply with new regulations, promulgated since the former selection, is without effect so far as the rights of the plaintiff are concerned, and it is wholly unauthorized by law.

It is urged that our conclusions herein are in direct conflict with the conclusions reached by the court in Jackson v. La Moure Co., 1 N. D. 238, 46 N. W. Rep. 449. That decision, however, is not necessarily in conflict with the opinion here expressed. In that case the court says: "It is, however, averred in the complaint, and admitted by the demurrer, that the company has never made the selection of the land in question, or any part thereof, and that the United States still holds the legal title to the land." Any discussion in that case as to what would be the law if the railroad company had selected the land in question is *dictum*, and is not binding upon the court. It was an opinion delivered upon an hypothetical state of facts not presented to the court, and is not necessary to a decision. The judgment of the district court sustaining the demurrer to the complaint is reversed, this court being of the opinion that the facts alleged and set up in the complaint are sufficient to constitute a cause of action.

CORLISS, C. J. (*dissenting*.) I am unable to agree with the views expressed in the prevailing opinion. The plaintiff invokes the interposition of equity to stay the collection of taxes assessed against its land grant in the county of McLean. It rests its claim for equitable relief upon two grounds: It insists that the land grant was exempt from taxation; it asserts that the tax proceedings were illegal and void. We will discuss these propositions in their order. The contention that the land grant was exempt is based upon the provisions of chapter 99 of the Laws of 1883. This statute, in substance, declares that in lieu of any and all other taxes upon the property of any railroad company there shall be paid a percentage of all the gross earnings of such company "arising from the operation of such railroad as shall be situated within this territory," and that such payment shall be in full of all taxation and assessment upon such property. To plaintiff's claim to exemption founded upon this

statute the defendant presents four answers: *First,* that the statute does not in fact exempt the land grant; *second,* that, if it be susceptible of the construction that it does in terms make such exemption, it is repugnant to the fourteenth amendment to the federal constitution, in that it denies to some citizens the equal protection of the laws of the territory by imposing upon them an increased burden of taxation arising from the exemption of this land grant from taxation; *third,* that it is within the inhibition of § 1925 of the United States Revised Statutes, prohibiting the territory from making any discrimination in taxing different kinds of property, and ordaining that all property subject to taxation shall be taxed in proportion to its value; *fourth,* that so much of the gross earnings law as relates to local earnings on interstate traffic is void, because repugnant to the exclusive grant to congress in the federal constitution of the power to regulate commerce among the several states, in that it taxes a portion of the earnings of such interstate commerce, and that the exemption, resting upon the validity of the entire tax as the consideration for such exemption, falls with the void portion of the tax, and therefore the act in its entire scope, including the exemption feature, is a nullity. The first three of these propositions will not be discussed in this opinion. The conclusion which I have reached as to the fourth answer of the defendant renders an opinion on the other questions unnecessary. The second and third will be sustained, because the federal circuit court has settled them in favor of defendant; and, being federal questions, I deem it our duty to follow that court on such questions.

Is, then, the act of 1883 unconstitutional in part? And, if so, is that part so important—is it of such magnitude—that it cannot be asserted that the legislature would have bargained away the right to tax plaintiff's property in consideration of the portion of the gross earnings tax, which would be constitutional if standing by itself? It seems to be clear, and, indeed, it is undisputed, that, if the act relates solely to gross earnings arising from purely local transportation, it would be constitutional. It would not in any sense interfere with interstate commerce. The plaintiff insists that this is the true construction

of the statute. We can find nothing to support the plaintiff's contention in this regard. The argument advanced is based on a sound principle, but that principle has no application in view of the language of the act and the circumstances surrounding its passage. The principle invoked by the plaintiff in this connection is that every legislature must be presumed to have intended to enact a constitutional law, and therefore, if the language of a statute is susceptible of two interpretations, equally reasonable, one of which will save it from the death-blow of the constitution, such construction must be adopted. This principle would be of controlling weight in this case if it could be seen that there was any room for doubt as to the intent of the legislature—if it could be said with any degree of plausibility that that body intended to tax only local earnings on local traffic. But it is unjustifiable to adjudge that the law-making power has established a rule different from that which it clearly intended to establish, for the sole purpose of sustaining a law in part, which cannot be upheld in its full scope. Such an application of the principle invoked would lead to the substitution by the courts of a deformed, dismembered, and emasculated statute, which the sovereign power would have scorned to enact, in place of a symmetrical and harmonious law. Say the court in French v. Teschemaker, 24 Cal. 554: "If any particular construction has the effect to declare the act, or any part of it, unconstitutional, such construction must be avoided when it can be fairly done, for the legal presumption is that the legislature could not h ave so intended. This, however, is to be taken with the qualifica tion that, where the language used is unambiguous, and the meaning clear and obvious, an unconstitutional consequence cannot be avoided by forcing upon it a meaning, however plausi ble it may be, which is, upon a fair test, repugnant to its terms." In Supervisors v. Brogden, 112 U. S. 261, 5 Sup. Ct. Rep. 125, the court said: "But if there were room for two construc tions, both equally obvious and reasonable, the court must, in deference to the legislature of the state, assume that it did not overlook the provisions of the constitution, and designed the act of 1871 to take effect. Our duty, therefore, is to adopt that construction which, without doing violence to the

fair meaning of the words used, brings the statute into harmony with the provisions of the constitution." See, also, U. S. v. Reese, 92 U. S. 214. The legislature declared in express terms that the gross earnings to be taxed were all gross earnings of the corporation owning or operating such railroad "arising from the operation of such railroad as shall be situated within the territory." The language is too clear to justify any doubt as to its meaning. The question is whether the gross earnings arose from the operation of the railroad situated within the territory. If so, they are taxed, and "all" such earnings are taxed. On a shipment from Bismarck to St. Paul that portion of the earnings for the transportation from Bismarck to Fargo is as much the result of the operation of the railroad situated within the territory as if the freight had been carried no further than Fargo. The statute includes in express terms all local earnings, whether arising from purely local or from interstate transportation. To give it the meaning contended for by plaintiff, we must interpolate into it a limitation of its broad import by construction. We must say that it relates only to local traffic, when it in terms embraces all traffic, interstate as well as local. While we are loath to declare a law unconstitutional, we are still more loath to set up by a species of judicial legislation a mangled statute in the place of a complete act, simply because the manifest intent of the legislature cannot stand before the supreme law of the land.

In the prevailing opinion, after some preliminary discussions, the conclusion is reached that the gross earnings subject to taxation under the law are "all the gross earnings arising from the operation within this territory of such railroad." I am content to accept this construction for the purpose of the argument, but I am at a loss to understand by what process of reasoning the conclusion is reached on this view of the statute that only local earnings on local traffic are taxed. To demonstrate the unsoundness of this conclusion, let us assume that each of the four states of Washington, Montana, North Dakota, and Minnesota should enact a law taxing all the gross earnings arising from the operation within these states, respectively, of the Northern Pacific Railroad Company. On a shipment from

some point in Washington to some point in Minnesota $1,000 of freight is earned by the company. Under the view adopted in the prevailing opinion, none of these gross earnings—*i. e.*, the $1,000—have arisen from the operation of the railroad within any one of these states. If that opinion embodies a correct interpretation of such a statute, it would be the opinion of the supreme court of each of these states. We would then have the unanimous voice of all these final tribunals declaring that, although this $1,000 had been earned by the operation of the road within these four states, yet in fact none of these earnings arose from the operation of the road within any one of these states. We go further, and say that, even if it could be claimed that the act of 1883 would admit of two constructions equally obvious, still it does not follow that that should not be adopted which would now make the statute unconstitutional, for the reason that when that law was enacted it was the general opinion of the profession and of courts that the federal supreme court had ruled that a tax on the gross receipts of a corporation arising not only from local, but also from interstate, commerce was valid. The supreme courts of Ohio and Missouri had already placed this construction on the federal court decision. We cannot assume that the legislature which passed this law was wiser than courts of eminent standing, which had before and which subsequently held such a law valid; nor that it entertained any other view of the question than that previously expressed by the courts of two of the states, but also by the highest arbiter, the federal supreme court itself; Ohio and Missouri having already declared that the court had so held. The principle underlying the doctrine that the meaning must be chosen which will render the statute constitutional is that the legislature must be deemed to have understood the true scope of the constitution, and therefore that the other construction would render their act void. But this rule can have no application where the profession, the highest courts of states, and, apparently, the highest court of the nation, had agreed at the time the act was passed that, giving it its broadest scope, its obvious meaning, it was nevertheless not condemned by the federal constitution. In short, when the act of 1883 was passed, it was regarded as settled

that the state could tax the local gross earnings of interstate commerce. The legislature so believed, and their language not only indicates that belief, but also that they acted upon it, and gave their enactment the wide scope which contemporary opinion justified as constitutional. It was not until the decision of Fargo v. Michigan, 121 U. S. 230, 7 Sup. Ct. Rep. 857, that it was supposed that a tax on interstate gross earnings was unconstitutional. This case was decided in April, 1887. The case of State Tax on Railway Gross Receipts, 15 Wall. 284, certainly appears to sustain such a tax; and the supreme court of Pennsylvania held that that was the doctrine which that case enunciated, in Steamship Co. v. Com., 104 Pa. St. 109; Car Co. v. Com., 107 Pa. St. 148; and Telegraph Co. v. Com., 110 Pa. St. 405, 20 Atl. Rep. 720. And in the late case of Canal Co. v. Com., 17 Atl. Rep. 175, the same court overruled these decisions, and distinctly states that they were based on the case in 15 Wall. 284, and that they correctly interpreted the scope and effect of that decision, which, however, had been practically overruled by the Fargo Case and the decision in Steamship Co. v. Pennsylvania, 122 U. S. 326, 7 Sup. Ct. Rep. 1118.

In Canal Co. v. Com., 17 Atl. Rep. 175, the supreme court adopted as its opinion the opinion of the trial court. Referring to the two later decisions of the federal supreme court, above cited, the trial court said: "If the cases thus referred to, with others therein quoted, and the language quoted, do not completely overthrow the authority of the State Tax on Railway Gross Receipts, we are at a loss to understand their meaning. Believing that they do, we think it our duty to disregard that decision, and to follow the later cases in holding that a statute which attempts to tax the gross receipts of transportation companies derived, in the language of the act before us, from "tolls and transportation, telegraph business, or express," is not valid, so far as such receipts are derived from commerce between points without the state." There is no doubt that the supreme court of Pennsylvania always has considered, and still does consider, that the case of State Tax on Railway Gross Receipts, 15 Wall. 284, sustained the constitutionality of a tax on the gross earnings of interstate commerce. The Michigan supreme court

placed the same construction on that decision in Fargo v. Auditor General, 57 Mich. 598, 24 N. W. Rep. 538, the case which was reversed in 121 U. S. 230, 7 Sup. Ct. Rep. 857, when the new doctrine was for the first time announced. In answer to the claim that the tax was unconstitutional because it was upon the interstate gross earnings of a corporation, the Michigan supreme court referred to the case of State Tax on Railway Gross Receipts, 15 Wall. 284; and in reply to an attempt to distinguish the case the court in emphatic language declared that that case held that a tax on the receipts of interstate commerce was not repugnant to the federal constitution, saying: "But the point decided was that such a tax was not invalid because in conflict with the power of congress to regulate commerce among the states." The syllabus in the case in 15 Wall. 284, certainly warrants this statement. It is as follows: "A tax levied upon the gross receipts of a railroad company is not in conflict with the constitution of the United States. Such a tax is not a tax upon interstate transportation." In the opinion the court said: "It was claimed in the state court that the act is unconstitutional so far as it taxes that portion of the gross receipts of companies which are derived from transportation from the state to another state, or into the state from another; and, the supreme court of the state having decided adversely to the claim, the case has been brought here for review." The decision of the state court holding the act to be constitutional in its entire scope was affirmed. In Telegraph Co. v. Mayer, 28 Ohio St. 521, the supreme court, in 1876—seven years before the passage of the gross earnings statute in question—held that the case in 15 Wall. 284 had settled the law in favor of the constitutionality of such a tax; the court deciding on the basis of that case that a tax on the gross receipts of telegraph companies was valid, although the gross receipts "arose chiefly from messages pertaining to such commerce, or from messages originating or terminating outside of the state, or were earned on the lines of such companies outside of the state." The same decision was made, and the same construction was placed upon 15 Wall. 284, in the case of Express Co. v. St. Joseph, 66 Mo. 675. This case was decided in 1877—six years before the gross earnings law of

1883 was passed in this territory. The court said: "But it is said, as the business of plaintiff consisted in receiving packages to be transported from St. Joseph to other points outside of the state, to which plaintiff's line did not extend, the tax upon the gross receipts of the plaintiff was violative of that provision of the constitution of the United States confiding to congress alone the power to regulate commerce with foreign nations and among the several states. In the case of Railroad Co. v. Pennsylvania, 15 Wall. 284, it was expressly held that a statute of a state imposing a tax upon the gross receipts of railroad companies is not repugnant to the constitution, though the gross receipts are made up in part from freights received for transportation from that state to another state; that such a tax is neither a regulation of interstate commerce nor a tax on imports nor upon interstate transportation." At the time the act of 1883 was passed there was no adjudication that a tax on gross earnings arising from interstate commerce was a regulation of commerce. There was apparently, and, in the opinion of this and other courts, actually, a decision to the contrary in the federal supreme court and in Ohio and Missouri, and it was the accepted doctrine that such legislation was valid. We agree with counsel for the plaintiff that the legislature must, if possible, be deemed to have intended to enact such a law as would be constitutional. But such a statute as we construe this to be would have been constitutional had not decisions—one of them in the federal supreme court—in force when it was enacted, been subsequently overruled. Not feeling justified in attributing to that body superhuman prescience, I must hold that they believed they had the power to tax the local gross earnings of interstate commerce, and therefore meant to tax them, having so declared in unmistakable terms. The territorial supreme court, in Railroad Co. v. Raymond, 5 Dak. 356, 40 N. W. Rep. 538, practically held that the act of 1883 related to local earnings on interstate as well as on local transportation. It is plain that the court in that case did not deem it possible to put such a construction on the statute as would limit its provisions to a tax on local traffic. This view of the meaning of the law would have obviated the necessity of

passing upon the constitutionality of any part of the act, for it would, under that interpretation, have related solely to a tax on local earnings, conceded to be valid by all the cases, and so held in this very decision. That such a tax is valid, see Sands v. Improvement Co., 123 U. S. 295, 8 Sup. Ct. Rep. 113; State Freight Tax, 15 Wall. 232; Fargo v. State, 121 U. S. 230, 7 Sup. Ct. Rep. 857; Ratterman v. Telegraph Co., 127 U. S. 411, 8 Sup. Ct. Rep. 1127. Courts are loath to hold any portion of an act unconstitutional, and the supreme court in that case would never have adjudged the unconstitutionality of that part of the statute which referred to interstate earnings could it possibly have held that such earnings were not within the purview of the law. Say the court on this point: "It is clear at the out-set, and conceded by the attorney general for the appellant, that so much of the act * * * as provides for a tax, or the payment of a percentage in lieu thereof, upon the gross earn-ings of a railroad company operating in this territory, received for business—the transportation of passengers and property not local, that is, not originating and ending wholly within this territory, but interstate, and therefore coming under the head of interstate commerce—is unconstitutional and void." The attorney general of the territory also construed the statute to refer to interstate gross earnings. In fact, all the officers of the territory charged with the enforcement of this law have adopted the same interpretation, and that construction was acquiesced in by the plaintiff and all other railroad corporations until the decision in the Fargo Case, when the plaintiff insisted, not that the act did not in terms relate to interstate earnings, but that, in so far as it did embrace such earnings, it was, in the light of the ruling in the Fargo Case, unconstitutional and void. The promptness with which the plaintiff seized upon this ground to resist the payment of the tax on interstate earnings furnished strong evidence that it did not consider that the other ground, now for the first time urged, existed.

A construction placed upon a statute by those intrusted with the enforcement of it is strong evidence of its meaning, es-pecially where, as in this case, that construction has been adopted by parties interested, when the contrary interpretation

would have saved them the payment of thousands of dollars of taxes annually.    Said the court in U. S. v. Johnson, 124 U. S. 236, 8 Sup. Ct. Rep. 446: "In view of the foregoing facts, the case comes fairly within the rule announced by this court that the contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous."    While the construction of this statute had not prevailed for a very long time, it was sustained by the voluntary concurrence of all the corporations interested in defeating such interpretation.    In U. S. v. Philbrick, 120 U. S. 52, 7 Sup. Ct. Rep. 413, the court, in stating the rule, eliminated the element of time, saying: "A contemporaneous construction by the officers upon whom was imposed the duty of executing those statutes, is entitled to great weight, and, since it is not clear that that construction was erroneous, it ought not now to be overturned."    To same effect, Hahn v. U. S., 107 U. S. 402, 2 Sup. Ct. Rep. 494; U. S. v. Pugh, 99 U. S. 265; Brown v. U. S., 113 U. S. 568, 5 Sup. Ct. Rep. 648, and cases cited.    Our statute embodies this principle: "Contemporaneous construction is, in general, the best."    § 4722, Comp. Laws.    The act of 1889 (chapter 107) is a legislative construction of the act of 1883.    Among other provisions, not important to be considered, it declares that "any company which has not complied with the provisions of chapter 99 of the Session Laws of 1883 by paying all taxes claimed on gross earnings, both territorial and interstate," etc.    Said the court in U. S. v. Freeman, 3 How. 556: "And if it can be gathered from a subsequent statute *in pari materia* what meaning the legislature attached to the words of a former statute they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute."    The soundness of this doctrine is expressly recognized in the prevailing opinion in this case in connection with the construction of the act of congress containing the land grant to the appellant, and it is applied in the case where the subsequent legislative construction of a prior act is much less emphatic and unmistakable than is the interpretation placed upon the gross

earnings law of 1883 by the gross earnings law of 1889. This later act expressly declares that a failure to pay a tax on the gross earnings, both territorial and interstate, is a failure to comply with the terms of the act of 1883. I can see no justification for a distinction which applies this rule of construction when the subsequent act throws but a faint light upon the meaning of the former statute, and utterly ignores this rule of construction in the same opinion with respect to a case where the legislative interpretation is full and explicit. Such interpretation, however, could not prevail against prior judicial construction of the clear meaning of the law. The language of the Michigan act, held unconstitutional in the Fargo Case, was quite similar to the act of 1883, in so far as the question as to what gross earnings were to be taxed is concerned. It provided for the payment by persons or corporations running railroad cars within the state of a fixed tax by a percentage on the "gross amount of their receipts for freight earned within the limits of the state." Yet in both the state and the federal supreme court it was undisputed that local earnings on interstate traffic were within the language of the act, these tribunals differing only as to the power to tax such earnings.

The next question is whether the portion of the act of 1883 exempting plaintiff's land grant (assuming that it does in fact exempt such property) falls within the unconstitutional part of the statute. On such a question authorities are unnecessary. The case is so plain that no case should be followed which would sustain the exemption under such circumstances. It was given for a consideration, six-sevenths of which has failed. In the Raymond Case it appeared that the tax derived from the percentage on earnings of local commerce was about one-seventh that which would be received from a percentage on the earnings of both local and interstate transportation. Nor do we need to test this question by what transpired subsequently to the enactment of the law. The Raymond Case is only an illustration of what every one, including the members of the legislature, knew when the act of 1883 was passed. It was known that the internal commerce of the territory was insignificant, as compared with its interstate commerce. The people were chiefly

engaged in agriculture. The larger proportion of such products must pass beyond the bounds of the territory to find a market. The purely internal shipments would be trifling in amount. But few of the other necessaries, and absolutely none of the luxuries, came from within our borders. Nor must we ignore the fact that the plaintiff's road was known to be one of the great arteries of the nation's business life, through which flowed and was destined to flow a current of strength and volume, not only of the nation's commerce within itself, but of the nation's commerce with foreign lands. With these facts before them, the legislature have declared their intention to tax the local gross earnings not only of local traffic, but also of transportation from points without to points within, from points within to points without, and wholly across the territory from and to points without; and that for such tax they granted the exemption. Shall we hold that they granted it for less, nay, for a pittance, in comparison with the tax they designated as the price? "If the parts of a statute are so mutually connected with and dependent upon each other as conditions, considerations, or compensations for each other as to warrant the belief that the legislature intended them as a whole, and that, if all could not be carried into effect, the legislature would not have passed the residue independently, then, if some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them." Cooley, Const. Lim. (5th Ed.) 213, 214, and cases cited; Meyer v. Berlandi, 39 Minn. 438, 40 N. W. Rep. 513; O'Brien v. Kreuz, 36 Minn. 136, 30 N. W. Rep. 458; Allen v. City of Louisiana, 103 U. S. 80; State v. Denny, 118 Ind. 449, 21 N. E. Rep. 274; Utsy v. Hiott, 30 S. C. 360, 9 S. E. Rep. 338; State v. Harris, 19 Nev. 222, 8 Pac. Rep. 462. In Lathrop v. Mills, 19 Cal. 530, the court said: "In order to sustain the excepted clause, we must intend that the legislature, knowing that the other provisions of the statute would fall, still willed that this particular section would stand as the law of the land." See, also, Baldwin v. Franks, 120 U. S. 678, 7 Sup. Ct. Rep. 656, 763. I therefore hold that the gross earnings law of 1883 is void in its entire scope for the reasons already stated.

I deem it my duty to hold that this law is in conflict also with § 1925 of the organic act of the territory of Dakota, and with the fourteenth amendment of the federal constitution. Such has been the ruling of the federal circuit court sitting in the district of North Dakota in the case of Railroad Co. v. Walker, 47 Fed. Rep. 681. This decision holds that the gross earnings law of 1889 is repugnant to this section of the organic act and to the fourteenth amendment. The act of 1889 and the act of 1883 are, so far as these questions are concerned, identical in their provisions. The decision applies with full force to the act of 1883, and, following this decision, as it is my duty to do under our dual system of government, I am constrained to hold this statute is void because the organic act and the fourteenth amendment are both violated by it. Said Judge CALDWELL in that case: "Property of the same kind, in the same condition, and used for the same purpose, must be taxed by a uniform rule, without regard to its ownership. The legislature having selected land as a subject of taxation, all lands under the same condition are subject to be taxed. The law for the taxation of land must operate equally and uniformly upon all lands the condition and use of which are similar. While property may be classified for the purpose of taxation, between the subjects of taxation in the same class there must be equality. Property of the same kind, in the same condition, and used for the same purpose, cannot be divided into different classes for purposes of taxation, and taxed by a different rule, because it belongs to different owners. But this is precisely what the act under consideration seeks to do. It exempts the lands of the company from taxation simply and solely because they belong to the company, and taxes all other lands, by a uniform rule, according to their value. It was not competent for the legislature, either under the organic act or the fourteenth amendment of the constitution of the United States, to classify the lands in the territory for purposes of taxation into lands owned by railroad companies and lands owned by all other persons, and declare that the former should not and the latter should be taxed." While I am willing to admit that much can be said on the other side of these two questions, and that their solution is not free

from difficulty, I am not willing to admit that we have any right to refuse to follow the construction of an act of congress, *i. e.*, § 1925 of the organic act of the territory of Dakota, and of the fourteenth amendment to the federal constitution, by the federal circuit court. On the contrary, our duty is clear in such a case, under all the adjudications, to follow where the federal court leads. Judicial courtesy, the prevention of unseemly conflict, the undoubted right of every sovereign to have its adjudications construing its own laws and constitution respected by the courts of every other sovereign, all call loudly for the strict enforcement of the rule which is ignored in this case. The federal supreme court never refuses to adopt the interpretation of a state statute or constitution by the state court; and much stronger is the reason why we should follow the construction by the federal court of a federal statute and of a clause of the federal constitution, because the constitution and laws of the United States are the supreme law of the land, and ultimately the state court can always, by judgment of the federal supreme court on writ of error, be compelled to accept such construction. There is no power which can coerce the federal courts, and compel an observance by them of the state court's construction of a state law, statutory or fundamental. While I do not deem it proper, in view of the decision in Railroad Co. v. Walker, to discuss the question whether the organic act is contravened by the exemption contained in the gross earnings law of 1883, there is one feature of the prevailing opinion that seems to me so utterly anomalous and unsound that I cannot suffer it to pass without comment. The position seems to be thus taken that whether this act violates the rule of uniformity in taxation prescribed by congress is not very important, because congress itself, by not disapproving of the act, has in effect ratified it, and it stands as though congress had in fact enacted it. The language of the opinion is: "By the organic act congress delegated this power [the taxing power] to the territorial legislature. The latter body exercised the power by passing the gross earnings law of 1883; and, as congress has never annulled or repealed the law, it has the same effect as a similar act of congress itself. It must be considered as, and is,

an act of congress, and must be given the same force and effect as though duly enacted by that body." The scope of this reasoning is that it is idle for congress, in delegating the taxing power to a territorial legislature, to set limitation to that power, as was done by the provisions of § 1925, because in every case congress must annul an act which sets at defiance this limitation prescribed by congress, or be regarded as ratifying the illegal act by its silence; nay, worse, its silence makes the act which it has already emphatically asserted should not be passed by the territorial legislature an act of congress itself. Having power to set bounds to the authority it delegates, and having unmistakably erected a barrier beyond which the body exercising such delegated authority may not pass, the prevailing opinion asserts the doctrine that nevertheless congress must pursue every usurpation of power by the territorial legislature in defiance of this limitation, and expressly annul such void act, or be deemed to have assented to it. Under such a view, I am at a loss to understand for what purpose the limitation upon the taxing power of the territorial legislature was enacted. The silence of congress, it is said, annuls it; and without it, it is clear that that body could have arbitrarily destroyed the gross earnings law, or any other law the territorial legislature might have passed. The case of Railroad Co. v. Le Sueur (Ariz.) 19 Pac. Rep. 157, is cited to sustain this view of the prevailing opinion. A most casual reading of the opinion discloses the fact that the case stands upon an express statute relating to the territory of Arizona and other territories, providing that "all laws passed by the legislative assembly shall be submitted to congress, and, if disapproved, shall be null, and of no effect." This provision did not apply to the territory of Dakota, but that territory, with others, was expressly excepted from the statute. Rev. St. U. S. § 1850. The opinion of Judge BARTHOLOMEW in the case of Trust Co. v. Whithed, *ante,* is extensively quoted from in the prevailing opinion in this case as being peculiarly pertinent to the question of the power of the legislature to classify as the territorial legislature classified the appellant's land grant by exempting it from taxation. I do not regard this

opinion (in which I concurred) as containing anything which sustains the appellant's contention in this behalf.

Are, then, the averments as to the defects in the tax proceedings such as to warrant the equitable relief sought? We will discuss the question first on the authorities, and then refer to our statute, which had wrought a change in the mode in which the taxpayer is required to do justice. The first irregularity set forth in the complaint is the ommission of the assessor to take and subscribe the statutory oath, and attach the same to the assessment roll. This defect is, however, conceded by the plaintiff and appellant to be insufficient to warrant the maintenance of this action without payment or tender of the tax, or an offer to pay it, set forth in the complaint, in the absence of statutory regulation. No such allegation is made, and therefore, under the authorities, this irregularity must be disregarded in determining whether the plaintiff has any right to be heard in equity, leaving our statute out of consideration for the present. Boeck v. Merriam, 10 Neb. 199, 4 N. W. Rep. 962; Hunt v. Esterday, 10 Neb. 165, 4 N. W. Rep. 952; Wood v. Helmer, 10 Neb. 65, 4 N. W. Rep. 968; Fifield v. Marinet Co., 62 Wis. 532, 22 N. W. Rep. 705; Railroad Co. v. Lincoln Co., 67 Wis. 478, 30 N. W. Rep. 619; Land Co. v. City of Crete, 11 Neb. 344, 7 N. W. Rep. 859; Stell v. Watson (Ark.) 11 S. W. Rep. 822.

The next irregularity pleaded as a ground for equitable relief without payment, tender, or offer to pay is the failure of the county clerk to "make out a tax list containing the description of the lands, * * * with a valuation of each or any of the tracts specified thereon, and the several species of taxes and the total taxes against the said tracts carried out in separate columns opposite each tract, and as nearly as practicable in the form set forth in § 37 and § 39 of chapter 28 of the Political Code of this territory." There is also an allegation in the same language relating to the duplicate list required by law to be furnished the county treasurer by the county clerk. These two defects will be discussed together. These allegations might be strictly true, and yet the defect in the list and in the duplicate list might be in some trifling matter of form which could not possibly affect the tax either in law or in equity. The sufficiency

of the pleadings, having been challenged by demurrer, is to be construed most strongly against the pleader, who, having the selection of the language in which to set forth his facts, can and should plead specifically all the particulars wherein there was a violation of the statute. Equity is loath to restrain tax proceedings, and, if a litigant insist that he has a right to relief without making payment or tender, he must point out the illegality of the tax with the utmost particularity. The speedy and unhampered collection of taxes is of great importance to the life of every government. Public policy, therefore, demands in this class of cases the rigid enforcement of the rule that the suitor must state the facts entitling him to relief clearly and explicitly. These allegations in this case are similar, so far as principle is concerned, to that which was condemned in Southard v. Dorrington, 10 Neb. 119, 4 N. W. Rep. 935, and Dillon v. Merriam, 22 Neb. 151, 34 N. W. Rep. 344. But assume that in neither the original nor the duplicate list was any value of plaintiff's property set down, would that warrant a court of equity in restraining the tax without payment or tender? The ground-work of the tax is not wanting. There is no claim that the levy was illegal, or that the assessment was not properly made. With these *data* lawfully and justly established, the amount of the plaintiff's taxes is a mere matter of calculation. Equity, regarding substance, and not form, seizes upon these two facts, and declares the amount of plaintiff's taxes then settled without further proceedings, basing its decision upon the maxim, *id certum est quod certum reddi potest*. A fixed value and a fixed rate lead inevitably to a fixed tax. Value and rate being justly and lawfully settled, all possibility of injustice to the taxpayer from disregard of statutory requirements vanishes. Nothing subsequent can lessen or enhance the amount of his contribution to the public funds. Under such circumstances, for equity to restrain the collection of the tax would be to aid the taxpayer in escaping a just obligation because of irregularities which could not possibly work him any injury, and which in no manner affected his duty to pay what equity regards as established by the assessment and levy, because it can be made certain by mere calculation. The principle underlying

numerous authorities justifies this view. Frost v. Flick, 1 Dak. 131, 46 N. W. Rep. 508; Moore v. Wayman, 107 Ill. 192; Hagaman v. Commissioners, 19 Kan. 394; Knox v. Dunn, 22 Kan. 683; Albany, etc., v. Auditor, 37 Mich. 391; Iowa Railroad Land Co. v. Sac Co., 39 Iowa, 124-128; Iowa Railroad Land Co. v. Carroll Co., Id 151-154; Challis v. Atchison Co., 15 Kan. 49; City of Lawrence v. Killam, 11 Kan. 499; Railroad Co. v. Tontz, 29 Kan. 460; DuPage Co. v. Jenks, 65 Ill. 275; Nunda v. Chrystal Lake, 79 Ill. 311-314; Trust Co. v. Weber, 96 Ill. 346-357; Parks v. Watson, 20 Fed. Rep. 764.

The other two allegations—that the county commissioners did not attach to the original and duplicate lists their warrants requiring the treasurer to collect the taxes, and that the county treasurer had not given the proper notice to acquire jurisdiction to sell the property for such taxes—are, under all the authorities, insufficient to warrant a restraint of the tax proceedings without payment or tender of the tax. A cloud on the title from illegal tax proceedings will ordinarily warrant a resort to equity to remove it. But a dominant principle of equity intervenes, and requires equity to be done by the taxpayer before he can secure the relief sought. He must, when the tax is valid in equity, pay or tender the tax as a condition precedent to his right of action. In all such cases our statute has substituted a judgment for such taxes in the action in place of tender or payment. It is thus equity is to be done by the taxpayer. The statute provides that the court shall in such cases render judgment for the tax. It treats the judgment for the tax as a substitute for the tax itself. The tax proceedings, being such as to cast or threaten to cast a cloud on the title, must be set aside, but the tax itself, with its penalties and interest, must be embodied in a judgment, on which execution shall issue as soon as the tax is delinquent. The penalties and interest which must be embodied in the judgment when rendered after the tax has become delinquent are those prescribed by law in cases of delinquency. § 1643, Comp. Laws; Farrington v. Investment Co., 1 N. B. 102.

The argument that the county has estopped itself from claiming the tax upon these lands because of having received its

share of the gross earnings tax paid by plaintiff, in lieu of all taxes upon the plaintiff's property, is utterly without foundation in principle. In the first place, there is wanting a vital element of estoppel. The payment by the plaintiff of the gross earnings was not induced by any word or act of the county from which the plaintiff would or did infer that the county, when it ultimately obtained its portion of the tax, would release the plaintiff from the payment of taxes due upon its lands. The receipt by the county of the money in lieu of all other taxes was necessarily after the plaintiff had paid the gross earnings tax to the territory, and this is what the complaint alleges. The plaintiff did not rely on anything said or done by the county when it paid the tax. It relied on its construction of the constitutionality and scope of the law. Moreover, it was not in the power of all the officers combined to estop the county by acts beyond their power. This is elementary law. The power of attorney of all such officers is in the statute. No person can rightfully rely on any assumption of power not found there. There is no estoppel because he knows that the claim of the right to exercise a power not conferred is without foundation. The county did not even agree with the plaintiff to accept its share of the gross earnings tax in lieu of all other taxes. But suppose the complaint had averred that the county had so agreed, what force could such an agreement have? None whatever. The county could act—could bind itself—only through officers of the county. All such officers together could not make such an agreement obligatory upon the county. There is no warrant for the exercise of such an extraordinary power found in the statute in express terms. Nor can such an authority be inferred. Every taxpayer has a direct interest in the payment by every other taxpayer of the county of his share of the taxes collected in and by the county. Every piece of property exempted from taxation increases the burden of all other property in the county. If the county officers can bind the taxpayers by agreeing to accept one dollar in lieu of a legal tax of $100, they can bind such taxpayers by a compact to virtually exempt certain property by a release of every thousand dollars of tax for a cent. Now, expand the exercise of this power until it sweeps over nearly all the

taxable property in the county, leaving only a trifling balance to bear the entire burden of taxation, and we would have presented the spectacle of local and inferior officers vested with particular powers, and exercising specific duties, in effect authorized to confiscate the entire property of the few for the benefit of the many, because this power to indirectly exempt can be so exercised as to throw upon the remaining property a tax equal to its entire value. A position which leads to a conclusion so revolting to reason and justice needs no further attack.

But it is said that by the payment of this tax, and by the receipt by the county of its share, the plaintiff has done equity. The position is untenable, for the reason that it does not appear from the complaint that the plaintiff has paid the tax in controversy, or that the county has received a sum equivalent to that tax by the receipt of its share of the gross earnings tax. Further, if the gross earnings law did not in terms exempt these lands, then the plaintiff has paid no part of the tax upon such lands. But we do not decide that question, for the reason already stated. The burden is on the plaintiff to show that it has done or offers to do not only partial, but full and unstinted equity. Until it avers the payment or tender of the tax in question, or of a sum equal to such tax, equity will lend it no aid, although it should be satisfied that a portion of such tax had, in effect, been received by the county. This reasoning, of course, ignores the statute which has substituted the tax judgment for payment or tender. But the principle is important, for where equity required payment or tender the statute provides for a judgment. 1 N. D. 102. The dissent of Justice WALLIN in that case was not upon this question.

The complaint avers the non-payment by the plaintiff of the cost of surveying, selecting and conveying the plaintiff's land grant within the territory of Dakota. Under the decision in Railroad Co. v. Traill Co., 115 U. S. 600, 6 Sup. Ct. Rep. 201, the lands would not have been taxable because of the lien of the government thereon for such unpaid expenses had congress not taken from plaintiff and other like companies the power to interpose its own dereliction of duty as a barrier against taxation. That act was approved July 10, 1886—a year before the

initiation of these tax proceedings—and provides "that no lands granted to any railroad by an act of congress shall be exempt from taxation by states, territories, and municipal corporations on account of the lien of the United States upon the same for the cost of the surveying, selecting, and conveying the same, or because no patent has been issued therefor; but this provision shall not apply to lands unsurveyed." In justice to the plaintiff's counsel it is proper to add that it is conceded that the failure to pay the costs of survey is of no moment in this controversy, in view of this statute. It appearing that the tax proceedings were so irregular that they would, when they should culminate in a tax deed, cast a cloud upon the plaintiff's title, the plaintiff had a right to maintain this action, in view of the statute and the interpretation placed upon it by this court in Farrington v. Investment Co., 1 N. D. 102; but judgment should have been rendered against the plaintiff and in favor of the defendant, as treasurer, for the amount of the taxes, penalties, and interest, as held by this court in the Farrington Case. The judgment of the district court should therefore be reversed, and that court directed to ascertain the amount of the taxes, with penalties, and interest from date of delinquency, as prescribed by law in cases of delinquency, and render judgment against plaintiff and in favor of defendant, as treasurer, for such amount, and also render judgment for plaintiff annulling the tax proceedings set forth in the complaint.

BARTHOLOMEW and WALLIN, JJ., having been of counsel, did not sit on the hearing of the above case, nor take any part in the decision; Judge WINCHESTER, of the sixth judicial district, and Judge McCONNELL, of the third judicial district, sitting in their places by request.